# CARPENTER ET AL. *v.* UNITED STATES

No. 86–422.  Argued October 7, 1987—Decided November 16, 1987

WHITE, J., delivered the opinion for a unanimous Court as to holding number 2, above.

*Don D. Buchwald* argued the cause for petitioners. With him on the briefs were *Jed S. Rakoff, Howard W. Goldstein, James Niss, E. Michael Bradley, I. Scott Bieler,* and *Alan R. Kaufman.*

*Solicitor General Fried* argued the cause for the United States. With him on the brief were *Assistant Attorney General Weld, Deputy Solicitor General Cohen, Charles A. Rothfeld, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman, Rosalind C. Cohen,* and *Katherine Gresham.* *

JUSTICE WHITE delivered the opinion of the Court.

Petitioners Kenneth Felis and R. Foster Winans were convicted of violating § 10(b) of the Securities Exchange Act of

---

*\*Benjamin W. Heineman, Jr.,* and *Carter G. Phillips* filed a brief for the Reporters Committee for Freedom of the Press et al. as *amici curiae* urging reversal.

1934, 48 Stat. 891, 15 U. S. C. § 78j(b),[1] and Rule 10b–5, 17 CFR § 240.10b–5 (1987).[2]  *United States* v. *Winans*, 612 F. Supp. 827 (SDNY 1985).   They were also found guilty of violating the federal mail and wire fraud statutes, 18 U. S. C. §§ 1341,[3] 1343,[4] and were convicted for conspiracy under 18

[1] Section 10(b) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

.        .          .             .            .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[2] Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

[3] Section 1341 provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

U. S. C. § 371.[5]   Petitioner David Carpenter, Winans' roommate, was convicted for aiding and abetting.   With a minor exception, the Court of Appeals for the Second Circuit affirmed, 791 F. 2d 1024 (1986); we granted certiorari, 479 U. S. 1016 (1986).

I

In 1981, Winans became a reporter for the Wall Street Journal (the Journal) and in the summer of 1982 became one of the two writers of a daily column, "Heard on the Street." That column discussed selected stocks or groups of stocks, giving positive and negative information about those stocks and taking "a point of view with respect to investment in the stocks that it reviews."   612 F. Supp., at 830.   Winans regularly interviewed corporate executives to put together interesting perspectives on the stocks that would be highlighted in upcoming columns, but, at least for the columns at issue here, none contained corporate inside information or any "hold for release" information.   *Id.*, at 830, n. 2.   Because of the "Heard" column's perceived quality and integrity, it had the potential of affecting the price of the stocks which it examined.   The District Court concluded on the basis of testimony presented at trial that the "Heard" column "does have an im-

---

[4] Section 1343 provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

[5] Section 371 provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

pact on the market, difficult though it may be to quantify in any particular case." *Id.*, at 830.

The official policy and practice at the Journal was that prior to publication, the contents of the column were the Journal's confidential information. Despite the rule, with which Winans was familiar, he entered into a scheme in October 1983 with Peter Brant and petitioner Felis, both connected with the Kidder Peabody brokerage firm in New York City, to give them advance information as to the timing and contents of the "Heard" column. This permitted Brant and Felis and another conspirator, David Clark, a client of Brant, to buy or sell based on the probable impact of the column on the market. Profits were to be shared. The conspirators agreed that the scheme would not affect the journalistic purity of the "Heard" column, and the District Court did not find that the contents of any of the articles were altered to further the profit potential of petitioners' stock-trading scheme. *Id.*, at 832, 834–835. Over a 4-month period, the brokers made prepublication trades on the basis of information given them by Winans about the contents of some 27 "Heard" columns. The net profits from these trades were about $690,000.

In November 1983, correlations between the "Heard" articles and trading in the Clark and Felis accounts were noted at Kidder Peabody and inquiries began. Brant and Felis denied knowing anyone at the Journal and took steps to conceal the trades. Later, the Securities and Exchange Commission began an investigation. Questions were met by denials both by the brokers at Kidder Peabody and by Winans at the Journal. As the investigation progressed, the conspirators quarreled, and on March 29, 1984, Winans and Carpenter went to the SEC and revealed the entire scheme. This indictment and a bench trial followed. Brant, who had pleaded guilty under a plea agreement, was a witness for the Government.

The District Court found, and the Court of Appeals agreed, that Winans had knowingly breached a duty of con-

fidentiality by misappropriating prepublication information regarding the timing and contents of the "Heard" column, information that had been gained in the course of his employment under the understanding that it would not be revealed in advance of publication and that if it were, he would report it to his employer. It was this appropriation of confidential information that underlay both the securities laws and mail and wire fraud counts. With respect to the § 10(b) charges, the courts below held that the deliberate breach of Winans' duty of confidentiality and concealment of the scheme was a fraud and deceit on the Journal. Although the victim of the fraud, the Journal, was not a buyer or seller of the stocks traded in or otherwise a market participant, the fraud was nevertheless considered to be "in connection with" a purchase or sale of securities within the meaning of the statute and the rule. The courts reasoned that the scheme's sole purpose was to buy and sell securities at a profit based on advance information of the column's contents. The courts below rejected petitioners' submission, which is one of the two questions presented here, that criminal liability could not be imposed on petitioners under Rule 10b–5 because "the newspaper is the only alleged victim of fraud and has no interest in the securities traded."

In affirming the mail and wire fraud convictions, the Court of Appeals ruled that Winans had fraudulently misappropriated "property" within the meaning of the mail and wire fraud statutes and that its revelation had harmed the Journal. It was held as well that the use of the mail and wire services had a sufficient nexus with the scheme to satisfy §§ 1341 and 1343. The petition for certiorari challenged these conclusions.

The Court is evenly divided with respect to the convictions under the securities laws and for that reason affirms the judgment below on those counts. For the reasons that follow, we also affirm the judgment with respect to the mail and wire fraud convictions.

## II

Petitioners assert that their activities were not a scheme to defraud the Journal within the meaning of the mail and wire fraud statutes;[6] and that in any event, they did not obtain any "money or property" from the Journal, which is a necessary element of the crime under our decision last Term in *McNally* v. *United States*, 483 U. S. 350 (1987). We are unpersuaded by either submission and address the latter first.

We held in *McNally* that the mail fraud statute does not reach "schemes to defraud citizens of their intangible rights to honest and impartial government," *id.*, at 355, and that the statute is "limited in scope to the protection of property rights." *Id.*, at 360. Petitioners argue that the Journal's interest in prepublication confidentiality for the "Heard" columns is no more than an intangible consideration outside the reach of § 1341; nor does that law, it is urged, protect against mere injury to reputation. This is not a case like *McNally*, however. The Journal, as Winans' employer, was defrauded of much more than its contractual right to his honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which "had its origin in the desire to protect individual property rights." *McNally, supra,* at 359, n. 8. Here, the object of the scheme was to take the Journal's confidential business information— the publication schedule and contents of the "Heard" column—and its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.

Both courts below expressly referred to the Journal's interest in the confidentiality of the contents and timing of the "Heard" column as a property right, 791 F. 2d, at 1034–1035; 612 F. Supp., at 846, and we agree with that conclusion.

---

[6] The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.

Confidential business information has long been recognized as property. See *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1001–1004 (1984); *Dirks* v. *SEC*, 463 U. S. 646, 653, n. 10 (1983); *Board of Trade of Chicago* v. *Christie Grain & Stock Co.*, 198 U. S. 236, 250–251 (1905); cf. 5 U. S. C. § 552(b)(4). "Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy." 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed. 1986) (footnote omitted). The Journal had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the "Heard" column. *Christie Grain, supra.* As the Court has observed before:

> "[N]ews matter, however little susceptible of ownership or dominion in the absolute sense, is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise." *International News Service* v. *Associated Press*, 248 U. S. 215, 236 (1918).

Petitioners' arguments that they did not interfere with the Journal's use of the information or did not publicize it and deprive the Journal of the first public use of it, see Reply Brief for Petitioners 6, miss the point. The confidential information was generated from the business, and the business had a right to decide how to use it prior to disclosing it to the public. Petitioners cannot successfully contend based on *Associated Press* that a scheme to defraud requires a monetary loss, such as giving the information to a competitor; it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important as-

pect of confidential business information and most private property for that matter.

We cannot accept petitioners' further argument that Winans' conduct in revealing prepublication information was no more than a violation of workplace rules and did not amount to fraudulent activity that is proscribed by the mail fraud statute. Sections 1341 and 1343 reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises. As we observed last Term in *McNally*, the words "to defraud" in the mail fraud statute have the "common understanding" of "'wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" 483 U. S., at 358 (quoting *Hammerschmidt* v. *United States*, 265 U. S. 182, 188 (1924)). The concept of "fraud" includes the act of embezzlement, which is "'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.'" *Grin* v. *Shine*, 187 U. S. 181, 189 (1902).

The District Court found that Winans' undertaking at the Journal was not to reveal prepublication information about his column, a promise that became a sham when in violation of his duty he passed along to his co-conspirators confidential information belonging to the Journal, pursuant to an ongoing scheme to share profits from trading in anticipation of the "Heard" column's impact on the stock market. In *Snepp* v. *United States*, 444 U. S. 507, 515, n. 11 (1980) *(per curiam)*, although a decision grounded in the provisions of a written trust agreement prohibiting the unapproved use of confidential Government information, we noted the similar prohibitions of the common law, that "even in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information obtained during the course of his employment." As the New York courts have recognized: "It is well established, as a general proposition, that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free

to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom." *Diamond* v. *Oreamuno*, 24 N. Y. 2d 494, 497, 248 N. E. 2d 910, 912 (1969); see also Restatement (Second) of Agency §§ 388, Comment *c*, 396(c) (1958).

We have little trouble in holding that the conspiracy here to trade on the Journal's confidential information is not outside the reach of the mail and wire fraud statutes, provided the other elements of the offenses are satisfied. The Journal's business information that it intended to be kept confidential was its property; the declaration to that effect in the employee manual merely removed any doubts on that score and made the finding of specific intent to defraud that much easier. Winans continued in the employ of the Journal, appropriating its confidential business information for his own use, all the while pretending to perform his duty of safeguarding it. In fact, he told his editors twice about leaks of confidential information not related to the stock-trading scheme, 612 F. Supp., at 831, demonstrating both his knowledge that the Journal viewed information concerning the "Heard" column as confidential and his deceit as he played the role of a loyal employee. Furthermore, the District Court's conclusion that each of the petitioners acted with the required specific intent to defraud is strongly supported by the evidence. *Id.*, at 847–850.

Lastly, we reject the submission that using the wires and the mail to print and send the Journal to its customers did not satisfy the requirement that those mediums be used to execute the scheme at issue. The courts below were quite right in observing that circulation of the "Heard" column was not only anticipated but an essential part of the scheme. Had the column not been made available to Journal customers, there would have been no effect on stock prices and no likelihood of profiting from the information leaked by Winans.

The judgment below is

*Affirmed.*