**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**John Naylor CLARK, III, and Russell G. Van Moppes, Defendants.**

**No. C87–711Z.**

United States District Court,
W.D. Washington,
Seattle Division.

Sept. 8, 1988.

James A. Kidney, John H. Sturc, Jerry A. Isenberg, Rudolph Gerlich, Jr., Wayne A. Wirtz, S.E.C., Washington, D.C., for plaintiff.

Steven D. Brown, Monroe Stokes Eitelbach & Lawrence, P.S., Seattle, Wash., David J. Hase, Nancy J. Sennett, Foley & Lardner, Milwaukee, Wis., for defendant John Naylor Clark, III.

Thomas A. Sterkin, Martin T. Collier, Betts Patterson & Mines, P.S., Seattle, Wash., W. Michael Drake, Drake & Rogosheske, Minneapolis, Minn., for defendant Russell G. Van Moppes.

## ORDER DENYING SUMMARY JUDGMENT

ZILLY, District Judge.

THE COURT has considered the SEC's motion for summary judgment against one of the defendants, Clark, together with the materials submitted by counsel. The motion is denied.[1]

### I. BACKGROUND

Smith & Nephew Associated Companies plc (SN) is a multi-national corporation, located in the United Kingdom, that manufactures and sells medical, health care, and various other products. In late 1983, Ro-

---

**1.** Additionally, the SEC has filed another motion that is related to this summary judgment motion. On June 21, 1988, defendant Van Moppes, who is not included in this summary judgment motion, filed a statement of opposition to the SEC's summary judgment motion. Thus, on July 27, 1988, the SEC filed a motion to strike Van Moppes' opposition on several grounds.

However, as the Court denies summary judgment without having considered Van Moppes' opposition, the Court finds that the SEC's motion to strike is moot. Thus, the motion is denied.

lyan Manufacturing Company, a manufacturer of health care products located in Wisconsin, was sold to SN and continued to operate as a subsidiary under its new name, Smith & Nephew Rolyan (SNR). At the time of this acquisition, defendant Clark was an officer and shareholder of Rolyan. After the merger, Clark continued as the principal executive of SNR with the title of president.

On January 14, 1985, SN acquired another company associated with the medical industry, Affiliated Hospital Products (AHP). At this time, SN also agreed to make a tender offer of $36 per share, payable in cash, for each AHP share held by the public. Clark remained president of SNR throughout the period in which the AHP acquisition was negotiated and consummated.

Before acquiring AHP, SN made an initial decision to expand its medical products business in the United States through the acquisition of other companies. Thus, SN assembled a team to search for further acquisitions for SN and for its subsidiary, SNR. Clark was part of this team and participated in meetings with various SN employees. At these meetings, the team discussed potential target companies and the needs and interests of SN.

At one meeting in particular, in late 1984, Clark saw a mold used for the manufacture of surgical gloves. Clark announced to those present in the room that SN must be considering the acquisition of a surgical glove company. Someone in the meeting acknowledged that Clark's observation might be accurate.[2] Additionally, Clark knew that only a few companies in the United States manufactured such gloves. Thus, based on his twenty years of experience in the medical supplies business, his participation on a SN acquisition team, and his knowledge of the surgical glove mold, Clark concluded that only AHP was available for acquisition.

On December 12, 1984, Clark met with a SN employee, Curtis Easter, who had been touring AHP plants in connection with the

acquisition. Clark has testified that, at this meeting, he told Easter that he "knew exactly what was going on." Clark Deposition, p. 39. It is unclear how, or whether, Easter responded to this assertion, although Easter has stated that it was his impression that Clark "knew" that SN was planning to acquire AHP. Easter Deposition, p. 23.

One day later, on December 13, 1984, Clark called his broker, codefendant Van Moppes, and ordered 2,000 shares of AHP stock. To disguise the purchase, Clark put the trade in his wife's maiden name and changed the address on her account to the address of her parents. Also on this day, Clark's wife, through her own broker, acquired 100 shares of AHP. Lastly, on December 21, 1984, Clark placed another order with Van Moppes for an additional 1,000 shares of AHP. In sum, Clark purchased a total of 3,000 shares of AHP stock at between 18⅛ and 19¾. His wife purchased her 100 shares at 17⅝.

After the acquisition and the $36 tender offer was announced in January, 1985, Clark and his wife sold their shares and realized profits of at least $49,131.32.

## II. DISCUSSION

The securities statute that is relevant to this "insider trading" action is section 10(b), 15 U.S.C. § 78j(b), which makes it unlawful for any person

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The corresponding regulation, Rule 10b–5, 17 C.F.R. § 240.10b–5, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate

2. Sometime after this meeting, Clark's "acquisition team" stopped meeting allegedly because

acquisition prospects recommended by his team were not receiving management attention.

commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

■ The civil enforcement mechanism for these provisions consists of both express and implied remedies. One express remedy is for a suit by the SEC for injunctive relief. *Aaron v. SEC*, 446 U.S. 680, 688, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980). Alternatively, it is settled that one of the implied remedies allows a court, exercising its equitable powers, to order disgorgement of profits in an SEC enforcement action. *See, e.g., SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir.1978); *SEC v. Lund*, 570 F.Supp. 1397 (C.D.Cal.1983).

■ The parties agree on the elements that are needed to establish insider trading. First, a breach of a duty to disclose information or abstain from trading must be established. *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114–15, 63 L.Ed.2d 348 (1980). Second, this information must be material and nonpublic. *Id.* Third, the insider must have acted with scienter. *Aaron*, 446 U.S. at 691, 100 S.Ct. at 1952–53. However, the parties dispute the applicable law with respect to when the

duty to disclose or abstain arises. Similarly, the parties dispute whether issues of material fact exist as to the second and third elements of insider trading, so as to preclude summary judgment.[3]

### A. *Duty to Disclose*

■ It is settled that a failure to disclose is actionable under section 10(b) and Rule 10b–5 only when there is a duty to disclose, which is primarily a duty to abstain from trading. However, Clark maintains that this duty arises exclusively when there is a fiduciary relationship between the insider and the investors involved in the securities transaction. Oppositely, the SEC contends that this duty arises when an insider "misappropriates" inside information and uses this information for his own benefit; this is duly named the "misappropriation theory." The Court adopts the misappropriation theory of liability.

The Supreme Court case of *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), provides a discussion of the two legal theories asserted by the parties. Chiarella was employed by a financial printer that handled the announcement of corporate takeover bids. Although the names of companies involved in the takeovers were concealed by blank spaces, Chiarella was able to deduce the names of the target companies from other information contained in the documents. Without disclosing this knowledge, Chiarella purchased stock in the target companies. Chiarella's conviction was reversed by a majority of the Court, which held that a duty to disclose under section 10(b) does not arise from the mere possession of nonpublic market information.[4] *Id.* at 235, 100

**3.** At the outset of Clark's memorandum, Clark argues that this summary judgment motion is premature because discovery has not been completed and there are still six months left for discovery. However, a defendant making this argument must demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact. *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir.1980), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). Clark has made no attempt to specify the facts

that additional discovery would provide. Further, the SEC points out that this case was filed almost a year before bringing this motion and that Clark has not made any attempt at discovery during this time. Thus, Clark's argument is unpersuasive.

**4.** Although *Chiarella* was a criminal case, the Court finds that it should apply with equal force to a civil enforcement action by the SEC. Because section 10(b) was written as both a criminal and regulatory piece of legislation, *United States v. Newman*, 664 F.2d 12, 66 A.L.R.Fed.

S.Ct. at 1118. Rather, liability was premised upon a duty to disclose arising from a relationship of "trust and confidence" between parties to the securities transaction. *Id.* at 230, 100 S.Ct. at 1115–16. Thus, absent a fiduciary relationship with the sellers of stock, a purchaser has no duty to disclose material, nonpublic market information.[5] *Id.* at 229, 100 S.Ct. at 1115.

However, both Justice Stevens' concurrence and Chief Justice Burger's dissent provide the cornerstone for the "misappropriation theory." Stevens argues that when Chiarella purchased securities in the open market

> he violated (a) a duty to disclose owed to the sellers from whom he purchased target company stock and (b) a duty of silence owed to the acquiring companies.

*Id.* at 237, 100 S.Ct. at 1119. From this proposition, Stevens agrees with the majority that no fiduciary duty existed and acknowledges that the Court left open the question of whether the conviction could have been affirmed on grounds of misappropriation since that theory had not been presented to the jury. *Id.*

Similarly, Burger's dissent postulates a broad theory of insider liability but uses a alternate theory. Specifically, Burger states that an absolute duty to disclose information or refrain from trading arises when a person has "misappropriated" nonpublic information.[6] *Id.* at 240, 100 S.Ct. at 1120–21. However, Burger does not put any parameters on this wide-ranging theory.

The Second Circuit has adopted Burger's misappropriation theory in name but the application of the theory has been modified in order to make it more specific and con-sistent.[7] In *United States v. Newman*, 664 F.2d 12, 66 A.L.R.Fed. 833 (2d Cir.1981), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), two officers of different investment banking firms passed inside information on prospective mergers and takeovers, garnered from their positions at the firms, to Newman, a securities broker. Newman then passed this information to others who purchased stock of the prospective merger and acquisition targets. The government charged that the conduct of those involved in this scheme constituted a breach of fiduciary duties owed to the investment banking firms, their clients, and their shareholders. Likewise, the court held that Newman's misappropriation constituted a breach of these fiduciary duties because the investment banks' reputations as safe repositories of client confidences were sullied and because the investment banks' clients suffered from artificially inflated stock prices of their target companies. *Id.* at 17.

Thus, *Newman* applies the misappropriation theory when one to whom confidential information is entrusted deceives his employer or his employer's clients. In other words, under the misappropriation theory, an employee's breach of his fiduciary relationship with his employer becomes relevant even though the employer is not one of the parties to the securities transaction.

Likewise, in *United States v. Carpenter*, 791 F.2d 1024 (2d Cir.1986), *aff'd by an equally divided court*, 479 U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), a reporter for the *Wall Street Journal* who wrote an influential business column for the paper participated in a scheme with a news clerk

833 (2d Cir.1981), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), there is no basis to distinguish the analysis of two types of actions that are in the same statutory framework.

5. This analysis represents the law that Clark asserts is the proper law to be applied to his case.

6. Brennan, Blackmun, and Marshall, JJ., in separate opinions, explicitly agree with this legal standard expressed by Burger.

7. Apparently, the Third Circuit has also adopted this misappropriation theory of liability. In *Rothberg v. Rosenbloom*, 771 F.2d 818 (3d Cir. 1985), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d, 501 (1987), the court stated that an insider violates the insider trading rule "when he uses insider information in violation of the fiduciary duty owed to the corporation to which he owes a duty of confidentiality." *Id.* at 822.

and two stockbrokers wherein the subjects of his articles were conveyed to the stockbrokers the day before publication. Thus, the stockbrokers could buy or sell based on the probable impact of the column on the market. The court of appeals stated that it was not constrained from recognizing misconduct outside of misconduct arising from trading by insiders who owe a fiduciary duty to investors. *Id.* at 1029. Thus, the court affirmed the defendants' convictions under the securities provisions, among others, for unlawfully misappropriating material, nonpublic information from the newspaper.[8]

In *SEC v. Materia,* 745 F.2d 197 (2d Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985), the misappropriation theory was again applied but this time in the context of a civil enforcement action by the SEC. There, Materia was employed by a printing firm that specialized in the printing of financial documents. Despite the efforts made by Materia's firm and by the firm's clients to keep confidential information confidential, Materia was able to define at least four tender offer targets. Based on this information, Materia purchased stock and sold securities of the target companies. Thus, the SEC sought an injunction against Materia to restrain him from stealing information and sought a finding that Materia should disgorge his "ill-gotten" gains. The court held that Materia's actions clearly constituted a misappropriation of nonpublic information in breach of a fiduciary duty owed to his employer. *Id.* at 203.

The above discussed cases are distinguishable from Clark's situation on the ground that the information exchanged definitively pointed towards a precise acquisition target, whereas Clark's information was not so clear. However, the Court believes that this difference does not preclude an application of the misappropriation theory to Clark. As will be shown, the reasoning of these cases applies with equal force

to Clark, as does the policy and legislative history behind the securities provisions. Also, the question of whether Clark's information was definitive is a question of "materiality," one of the other elements of insider trading.

Undoubtedly, the misappropriation theory represents the preferable standard of liability for an insider such as Clark. As was argued by the court of appeals in *Carpenter,* the securities laws which combat fraud should be construed not technically and restrictively but flexibly. *Carpenter,* 791 F.2d at 1029. Similarly, as Burger's dissent in *Chiarella* emphasized, section 10(b) and Rule 10b–5 clearly support a misappropriation standard because these securities provisions "reach *any* person engaged in *any* fraudulent scheme." *Chiarella,* 445 U.S. at 240, 100 S.Ct. at 1121. Thus, if Clark is ultimately found to have acted with scienter, the securities laws should be broadly construed to hold Clark liable for insider trading.

Second, an application of the misappropriation theory to Clark would promote the purposes and policies underlying section 10(b) and Rule 10b–5, the most important of which is the protection of investors. *Carpenter,* 791 F.2d at 1030. These antifraud provisions were designed primarily " 'to assure that dealing in securities is fair and without undue preferences or advantages among investors.' " *Chiarella v. United States,* 445 U.S. 222, 241, 100 S.Ct. 1108, 1121, 63 L.Ed.2d 348, 365 (1980) (Burger, J., dissenting) (quoting H.R.Conf. Rep. No. 94–229, p. 91 (1975), U.S.Code Cong. & Admin.News 1975, p. 323). In other words, there is an inherent unfairness in allowing an insider to enter the open market and trade for his own account on the basis of material inside information " 'knowing ... [such information] is unavailable to those with whom he is dealing,' i.e., the investing public." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968), *cert. denied,* 404 U.S. 1005, 92

---

8. The Supreme Court's affirmance in *Carpenter v. United States,* 479 U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), does not provide any further guidance regarding the propriety of the misappropriation theory. The Court merely

stated that it was "evenly divided with respect to the convictions under the securities laws and for that reason affirms the judgment below on those counts." 479 U.S. at ——, 108 S.Ct. at 320, 98 L.Ed.2d at 282.

S.Ct. 561, 30 L.Ed.2d 558 (1971) (quoting *Matter of Cady, Roberts & Co.*, 40 SEC 907, 912 (1961)). Thus, the integrity of the marketplace is insured by holding an insider accountable for his misappropriation, and the inequity of trading with a corporate insider who has superior access to material insider information is compensated. *Id.* Consequently, if Clark's information is found to be material, the purposes underlying the securities provisions would be served by holding Clark liable for his acts.

Finally, the legislative history of the Securities Exchange Act reveals that the Act was meant "to condemn *all* manipulative or deceptive trading ..." *Carpenter,* 791 F.2d at 1030 (emphasis added). Accordingly, section 10(b) prohibits " 'those manipulative and deceptive practices which have been demonstrated to fulfill no useful function.' " *Chiarella,* 445 U.S. at 241, 100 S.Ct. at 1121 (Burger, J., dissenting and quoting S.Rep. No. 792, 73d Cong., 2d Sess., 6 (1934)). It is beyond doubt that if Clark's use of the securities markets is found to be fraudulent, his actions would have served no useful function but, rather, would have benefitted only Clark at the expense of others.

■ In sum, it is for these reasons that the Court holds that the misappropriation theory is the appropriate standard to determine whether Clark had a duty to disclose his inside information or to refrain from trading.

### B. *Disputed Facts*

Summary judgment is proper only where there is no genuine issue of any material fact or where, viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law. *SEC v. Murphy,* 626 F.2d 633, 640 (9th Cir.1980). The Court finds that there are disputed issues of fact as to two elements of insider trading, whether Clark acted with scienter and whether the information on which he traded was "material."

#### 1. Clark's Scienter

■ The element of "scienter" refers to a mental state embracing an intent to deceive, manipulate, or defraud. *See* 15 U.S. C. § 78j(b); *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Whether a defendant acted with scienter is a question of fact to be determined in the context in which the defendant was operating at the time of the transaction in question. *Huddleston v. Herman & MacLean,* 640 F.2d 534, 546 (5th Cir.1981), *modified,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

■ As evidence of Clark's intent to deceive or defraud his employer, SN, the SEC first alleges that Clark knew that his suspicion that SN was looking to acquire a surgical glove company should have been kept confidential. Second, at some point in time, Clark was told that he would not be involved with the actual acquisition of the company SN would target (which turned out to be AHP). The SEC maintains that because of this, Clark was offended, grew angry, and decided to buy AHP stock out of "pique." Thus, argues the SEC, Clark decided to deceive and defraud SN by purchasing AHP stock in his wife's maiden name and using his wife's parents' address.

However, Clark contends that he never had actual knowledge of the acquisition, only a suspicion or a hunch. Thus, he had no basis for keeping any information confidential. With respect to Clark's use of his wife's name, Clark maintains that this occurrence is not evidence of intent but, rather, merely supports competing inferences on the issue of intent. Additionally, Clark testified that he believed that if he was not part of the acquisition effort, he was not prohibited from trading.

Although the SEC's evidence on this issue is quite strong, the Court finds that when drawing all inferences in favor of Clark, the nonmoving party, a trier of fact might conclude that Clark never formed an intent to deceive SN. Furthermore, the Court is persuaded by the fact that where intent is a primary issue, summary judgment is usually inappropriate. *SEC v. Sea-*

*board Corp.,* 677 F.2d 1297, 1298 (9th Cir. 1982). Thus, the Court holds that the factual issue of Clark's scienter is genuinely disputed and precludes granting summary judgment.

### 2. Clark's Trading on Material Information

■ The test of materiality is whether a fact "would have been viewed by the reasonable investor as having *significantly* altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976) (emphasis added).

The SEC states that Clark traded while in possession of three pieces of information: the glove mold, his general knowledge of SN's acquisition program, and his familiarity with the identity of surgical glove manufacturers. Thus, the SEC argues that it was by virtue of Clark's employment that he had this information and that he was able to piece together SN's negotiations with AHP. Accordingly, this information was allegedly material.[9]

Of course, Clark disputes whether he had sufficient information about the stage of the merger discussions at the time of purchasing AHP stock for this information to be material.

However, regardless of the actual stage of negotiations at the time Clark purchased AHP stock, the Court finds that there is a disputed issue of fact as to whether Clark's circumstantial knowledge of the negotiations was sufficient to be material in the eyes of a reasonable investor. Additionally, the determination of the materiality of inside information is "peculiarly" one for the trier of fact. *See SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8 (2d Cir.1977). Thus, the Court holds that the factual dispute regarding the materiality of Clark's information provides a basis for denying summary judgment.

### III. CONCLUSION

Because the Court concludes that summary judgment is inappropriate at this stage of the proceedings, a discussion on the propriety of the SEC's requested remedies is premature.

THEREFORE, the SEC's motion for summary judgment against defendant Clark is DENIED.

---

9. The Court finds that it is beyond dispute that this information was "confidential."