**UNITED STATES of America**

**v.**

**William Edward ReBROOK III.**

**Crim. No. 2:93–00151.**

United States District Court,
S.D. West Virginia,
Charleston Division.

Oct. 26, 1993.

Larry R. Ellis and Hunter P. Smith, Jr., Asst. U.S. Attys., Charleston, WV, for plaintiff.

A.T. Ciccarello, Charleston, WV, for defendant.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are Defendant's two motions to dismiss the indictment, filed pursuant to the provisions of *Rule* 12(b)(2), Fed.R.Crim.P., on September 10, 1993 and September 22, 1993. Defendant is charged in a two-count indictment filed June 17, 1993, with wire fraud and insider trading arising from his alleged misuse of confidential information he purportedly gained by virtue of his position as lawyer for the West Virginia Lottery to purchase certain publicly traded stocks and advise others to do so. Defendant contends the indictment is legally insufficient. The Court has carefully considered Defendant's positions and, for reasons set forth below, determines they lack merit.

### I.

In 1984, West Virginians approved an amendment to the state constitution authorizing the Legislature to establish a state-run lottery. W.Va. Const. art. VI, § 36 (1984). The Legislature in 1985 created the Lottery[1], mandating its profits be employed to

---

**1.** The West Virginia Lottery Act is set forth at W.Va.Code §§ 29–22–1 to –28.

benefit education, senior citizens and tourism. W.Va.Code § 29–22–18(f). The Legislature also created a seven-member Lottery Commission ("the commission") with authority to establish the type and number of games to be implemented by the Lottery and promulgate game rules. W.Va.Code § 29–22–5. The Legislature as well established the position of Lottery director ("the director") to manage and administer the Lottery and gave the director authority to hire, with commission approval, professional personnel necessary to the Lottery's operation. W.Va.Code §§ 29–22–6 and –8. The commissioners and director are gubernatorial appointees. W.Va.Code §§ 29–22–4 and –6.

Although the Legislature in 1985 appears to have allowed the Lottery to employ games using electronic terminals known in the gaming trade as video lottery machines,[2] it prohibited Lottery games from using themes of bingo, roulette, dice or similar games associated with casino gambling, W.Va.Code § 29–22–9(b)(1) (1985) (repealed in 1990), and required at first the Lottery initiate operation of "the preprinted instant winner type lottery." W.Va.Code § 29–22–9(a). The Legislature repealed the casino-theme prohibition in 1990. Shortly afterward, the commission authorized a video lottery "test run" at Mountaineer Park, a horse racing track in Chester, West Virginia. Expansion of video lottery in West Virginia beyond Mountaineer Park has not occurred.

In brief summary, the allegations of the indictment are as follows.[3] Defendant Re-Brook accepted employment as attorney for the West Virginia Lottery in April, 1990. Beginning in February, 1992, several gaming equipment companies sought to obtain a portion or all the video lottery equipment sales that would result from an anticipated plan to expand video lottery statewide. Among these companies was Video Lottery Consultants, Inc. ("VLC"), a publicly traded corpo-

ration headquartered in Bozeman, Montana. Defendant, by virtue of his fiduciary relationship with the Lottery as its lawyer, knew of confidential information regarding Lottery business including the bidding for and awarding of contracts with the Lottery.

Among the confidential information to which Defendant was privy was a plan of the Governor of West Virginia and the Lottery director formulated as early as February, 1992, to implement a statewide video lottery immediately following the 1992 general election. Defendant also knew this expansion plan was revised in September 1992, to provide that the State would grant an exclusive contract to a single gaming company, granting the successful bidder a monopoly on the sale of video lottery machines in West Virginia. Such a "sole source contract" would be worth at least $25 million to the entity awarded the monopoly.

Aware of the confidential plan to expand video lottery after the election and the fact that VLC was a likely financial beneficiary of the proposal, Defendant devised a scheme to enrich himself and others by misappropriating the confidential information. Executing that scheme, Defendant purchased 100 shares of VLC stock on September 24, 1992. Then he shared the confidential information with three acquaintances, one of whom bought 2000 shares of stock in VLC on September 25, 1992, and another of whom purchased 4000 shares during early January, 1993. During the period after Defendant purchased VLC stock, he continued to function as Lottery counsel and further the plan to expand video lottery throughout West Virginia.

The Government contends Defendant's activities in connection with the alleged misappropriation of confidential information gained through his position as Lottery attorney con-

---

**2.** W.Va.Code § 29–22–9(c) states, in relevant portion: "The commission shall proceed with operation of such additional lottery games, including the implementation of games utilizing a variety of existing or future technological advances at the earliest feasible date. The commission may operate lottery games utilizing electronic computers and electronic terminal devices and systems ..." *See also*, Op. Att'y Gen., Feb. 14, 1991, No. 12 (the Legislature has charged the Commission with authorizing lottery games including video lottery).

**3.** The Court does not question the verity of the indictment. For the purpose of resolving Defendant's motions to dismiss, the Court must accept the Grand Jury's charge as true. *See infra* § II.

stituted wire fraud in violation of 18 U.S.C. §§ 1343 [4] and 1346,[5] and insider trading in violation of 15 U.S.C. §§ 78ff [6] and 78j(b) [7] and 17 C.F.R. § 240.10b–5.[8] Defendant raises several challenges to the legality of the indictment and the sufficiency of its allegations, and insists to require him to defend on these charges at trial would be "contrary to the interests of justice."

## II.

■ At the outset, the Court notes an accused enters upon an arduous course when he moves to dismiss an indictment. *Rule 7(c)(1)*, Fed.R.Crim.P., requires only that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." When a motion to dismiss attacks the sufficiency of an indictment, the Court must view the evidence in the light most favorable to the Government, *United States v. Mills*, 995 F.2d 480, 489 (4th Cir.1993), and must accept as true the allegations of the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962); *United States v. Stillwell*, 799 F.Supp. 615, 617 (S.D.W.Va.1992).

■ A motion to dismiss is not a device for the summary trial of evidence and it is addressed only to the facial validity of the indictment. *United States v. Eichman*, 756 F.Supp. 143, 146 (S.D.N.Y.1991). The Court's duty in considering Defendant's motion is to test whether the indictment sufficiently charges the offenses it sets forth against Defendant. *Sampson*, 371 U.S. at 78–79, 83 S.Ct. at 174–75. If the indictment sets forth the elements of the crimes of which it accuses the Defendant in sufficient detail to notify him of the charges he faces, and does not present double jeopardy problems, it is immune to attack by a motion to dismiss.[9] *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2875, 41 L.Ed.2d 590 (1973); *Eichman*, 756 F.Supp. at 146.

## III.

■ Insider trading, in its "classical" form, involves corporate employees who violate the securities laws by either trading in their company's stock based on material nonpublic information, or by tipping others about the confidential corporate information. The Government does not allege Defendant was a VLC insider, or that he occupied a relationship of trust and confidence with the company. Rather, the Government's theory of prosecution is grounded in Defendant's status as an insider at the Lottery. As Lottery

4. 18 U.S.C. § 1343 provides in relevant portion:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purposes of executing such scheme or artifice ... [shall be guilty of an offense against the United States].

5. 18 U.S.C. § 1346 provides: "For the purposes of this chapter [criminalizing mail, wire and bank fraud], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

6. 15 U.S.C. § 78ff sets forth the penalties for violation of securities exchange laws.

7. 15 U.S.C. § 78j(b) provides in relevant portion:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securi-

ties exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

8. 17 C.F.R. § 240.10b–5 (Section 10(b), Securities Exchange Act of 1934) provides in relevant portion:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme or artifice to defraud ... or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

9. Defendant asserts no claim these charges violate his right against double jeopardy.

attorney, Defendant was privy to confidential information about the Lottery and its dealings, both planned and practiced, with particular corporations, including VLC. The Government contends Defendant violated a fiduciary relationship with the Lottery by using this confidential information for his personal gain.

Courts have dubbed this concept of insider trading the misappropriation theory. The theory apparently originated in the concurring opinions and dissent of *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (Stevens, J., concurring at 238, 100 S.Ct. at 1119; Brennan, J., concurring at 238–39, 100 S.Ct. at 1120; Burger, C.J., dissenting at 243–45, 100 S.Ct. at 1122–23). *See* Patrick Coughlin, *Insider Trading—The Misappropriation Theory*, C859 A.L.I.–A.B.A. 583 (1993). The Second Circuit summarized the theory in *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir.1991) (*en banc*): "Under this theory, a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction."

Unlike the classical theory of insider trading, the misappropriation theory does not require that the buyer or seller of securities be defrauded; rather, "the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may be unaffiliated with the buyer or seller of securities." *Chestman*, 947 F.2d at 566. The owner of the misappropriated information need not be the corporation whose shares are traded. *United States v. Libera*, 989 F.2d 596, 599 (2d Cir.1993).

To date, the Supreme Court has not validated the misappropriation theory.[10] Nevertheless, four circuits and several district courts have adopted the theory. *See, e.g., Libera*, 989 F.2d at 599; *SEC v. Cherif*, 933 F.2d 403, 410 (7th Cir.1991); *SEC v. Clark*, 915 F.2d 439, 448 (9th Cir.1990); *Rothberg v.*

*Rosenbloom*, 771 F.2d 818, 822 (3d Cir.1985), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 501 (1987); *SEC v. Willis*, 777 F.Supp. 1165, 1169 (S.D.N.Y.1991); *SEC v. Peters*, 735 F.Supp. 1505, 1519 (D.Kan.1990); *United States v. Elliott*, 711 F.Supp. 425, 430 (N.D.Ill.1989); *SEC v. Clark*, 699 F.Supp. 839, 843 (W.D.Wash.1988). Moreover, this Court is unaware of any reported decision either criminal or civil rejecting the theory.

The indictment also charges Defendant with wire fraud. To establish the offense of wire fraud, the Government must prove Defendant knowingly devised or intended to devise a scheme or artifice to defraud, and that in furtherance of that scheme or artifice, he transmitted or caused to be transmitted by means of wire, radio or television communication in interstate commerce any writings, signs, signals, pictures, or sounds. 18 U.S.C. § 1343. The term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services. 18 U.S.C. § 1346.

■ The indictment here relies on the same factual predicate for both the charges of insider trading and wire fraud. The Government charges the Defendant with devising a scheme to defraud the State of West Virginia, its citizenry, and the Lottery of Defendant's honest and faithful services as Lottery attorney by misappropriating and utilizing confidential nonpublic information regarding an alleged plan to expand video lottery in West Virginia. The indictment also accuses Defendant of trading in and tipping others to trade in VLC stock based on the confidential information.

Defendant argues the information about video lottery expansion in West Virginia upon which he based his decision to purchase VLC stock and which he shared with at least three acquaintances does not meet the requirements of the misappropriation theory or the wire fraud statute because it was neither nonpublic nor confidential, but in fact was

---

**10.** In *Carpenter v. United States*, 484 U.S. 19, 24, 108 S.Ct. 316, 319, 98 L.Ed.2d 275 (1987), the Court was "evenly divided" with respect to convictions under the securities laws on the misappropriation theory, and affirmed the judgment below on that ground. An affirmance by an evenly divided court is "not entitled to precedential weight." *See Neil v. Biggers*, 409 U.S. 188, 192, 93 S.Ct. 375, 379, 34 L.Ed.2d 401 (1972). The Court's position on the efficacy of this theory thus remains unclear.

widely known. The Government correctly notes Defendant's arguments in this regard amount not to faulting the indictment charges, but to contentions merely that the Government cannot prove the allegations. As such, the arguments are unavailing on a motion to dismiss. For the same reason, Defendant's argument there was never a "plan" to expand video lottery after the general election is improper in context of a motion to dismiss. The Court agrees and disregards these arguments as prematurely raised at this stage of these proceedings. *See supra* § II.[11]

Defendant next argues because the material nonpublic information he allegedly misappropriated was not information "intended solely for corporate purposes," he cannot be guilty of insider trading or wire fraud. He further contends because he had no "relationship" with VLC which gave rise to a "duty" for him to either disclose the material nonpublic information or refrain from trading in stock, the charges in the indictment are fatally flawed.

■ As discussed previously, the misappropriation theory prohibits trading in securities based on material nonpublic information acquired in violation of a duty to *any* owner of such information, whether or not the owner is the corporation whose shares are traded.[12] *Libera*, 989 F.2d 596, 599. That Defendant owed no duty to VLC or its shareholders, or that the confidential information was not solely for the corporation's purposes, is of no moment.[13]

■ Defendant next argues the Court should dismiss the indictment because the information Defendant allegedly misappropriated was not "material" within the meaning of the securities laws. The test for materiality as set forth by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), is whether there is a substantial

---

**11.** Defendant has appended to his motion the text of 455 articles discussing video lottery published in Charleston newspapers, 189 of which were printed prior to Defendant's purchase of VLC stock. These articles demonstrate the public was aware generally there was a plan afoot to expand video lottery; but Defendant has cited the Court to no documentation showing it was public information that statewide expansion of video lottery was planned definitively for implementation immediately following the 1992 general election.

Defendant's alleged statement to Bernard J. Folio excerpted in the indictment itself indicates the plan was known only to an exclusive few, and was by no means generally known to the public:

"Well, you can keep this under your—it's no secret, because every machine operator in West Virginia knows this, so I'm not talking out of school, but it's not something that you want to make public statements about.

"[Governor] Caperton is going to allow the Lottery Commission, as soon as the general election is over, to go full speed ahead with the video lottery, full speed ahead."

Were there indeed such a plan, it must have been concealed from the public by necessity. The Government alleges video lottery was to be expanded only after the general election because polls showed West Virginia's citizenry largely disfavored the concept of a statewide video lottery. If the public had known video lottery expansion was imminent, clearly there would have been no incentive to delay its implementation until after the election.

More significantly, the indictment alleges Defendant knew, by virtue of his position as Lottery attorney, the Governor and director planned to award the video lottery equipment contract on a sole source basis. The Government figures the sole source contract would have been worth about $25 million to its recipient. This information would, of course, have been crucial to a decision to purchase stock in a particular gaming equipment company. There is no indication the sole source plan was known publicly.

The Supreme Court noted in *Dirks v. SEC*, 463 U.S. 646, 653 n. 12, 103 S.Ct. 3255, 3261 n. 12, 77 L.Ed.2d 911 (1982), proper and adequate disclosure of inside corporate information "can only be effected by a public release through the appropriate public media, designed to achieve a broad dissemination to the investing public generally and without favoring any special person or group." Defendant has failed to indicate the information the Government contends he misappropriated was known to the requisite extent under this standard to render it "public."

**12.** Defendant's duty to his employer, the Lottery and the citizens of West Virginia, is discussed *infra* § IV.

**13.** Defendant's similar claim that for him to be prosecutable under the misappropriation theory, there must have existed a fiduciary relationship between the Lottery and VLC is squarely refuted by *Chestman*, which held the predicate act of fraud may be perpetrated on the source of the nonpublic information, even though the source may have been unaffiliated with the buyer or seller of securities. *Chestman*, 947 F.2d at 566.

likelihood that a reasonable shareholder would consider the information important in deciding how to vote.

Defendant is correct a materiality determination may not be rooted in purely "speculative" or "contingent" possibilities. *Taylor v. First Union Corp. of South Carolina,* 857 F.2d 240, 244 (4th Cir.1988). "[M]ateriality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.'" *Basic, Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988) (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968) (*en banc*)).

■ Applying the *Levinson* balancing test to the case at bar, the Court does not hesitate in holding the nonpublic information the Government alleges Defendant misappropriated was indeed "material." Beyond cavil the investing public would consider important the information that VLC was about to receive a multi-million dollar contract making the company West Virginia's sole equipment supplier for a statewide video lottery. The Government alleges approval of a video lottery by the commission was a near certainty given the commissioners' predisposition to expand video lottery. Certainly, approval by the commission was by no means so speculative as to render information about the plan to expand video lottery immediately after the election immaterial. This contention of Defendant does not warrant dismissal of the indictment.

■ Defendant's remaining quarrels with the indictment's insider trading charge are meritless, and can be dispatched with little discussion. He argues the indictment fails because the information he allegedly misappropriated could not have been nonpublic because West Virginia's Freedom of Information Act ("FOIA"), W.Va.Code §§ 29B–1–1 to –7, makes public all Lottery records and proceedings. The indictment alleges, however, the plan to expand video lottery statewide after the general election and to award a sole-source contract for video lottery equipment was secret, irrespective of whether it was discloseable under the West Virginia

FOIA. That Lottery business was to be public by law at the time this alleged plan was formulated does not necessarily mean it was public in practice.

■ Defendant further argues the indictment is insufficient because it fails to allege Defendant's conduct caused a "loss" to a "victim." When Congress enacted 18 U.S.C. § 1346, it eliminated the necessity that the prosecution establish a monetary or property loss, and specifically provided the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the "intangible right of honest services." Here, the indictment alleges Defendant deprived his employer, the Lottery and the citizens of West Virginia, of the Lottery's good name, its confidential information, and its right of honest services. Defendant's argument in this regard is without merit.

The indictment properly and sufficiently alleges Defendant misappropriated material nonpublic information in breach of a fiduciary duty and used that information in a securities transaction. It appropriately alleges facts which, if proved, would establish a violation as well of the wire fraud statute. 18 U.S.C. § 1343. Viewing the allegations as it must in the light most favorable to the Government, the Court determines the indictment properly charges the offenses of insider trading under the misappropriation theory and wire fraud. Defendant raises no meritorious claim the indictment fails to apprise him adequately of the charges he faces. Defendant's motion to dismiss the indictment on this basis fails.

## IV.

Defendant's second motion to dismiss asserts generally he cannot be charged with defrauding the State of West Virginia of his honest services because no clear duty of honest services arose from his position as Lottery counsel. He also challenges on vagueness grounds the "honest services" standard set forth in 18 U.S.C. § 1346, because he has not "been able to find any definition or designation of specific acts which would constitute a violation of the general duty of loyalty,

honesty, independence, impartiality and integrity."

■ Although Defendant does not deny he served as Lottery attorney, he nonetheless asserts he was not a public employee of the State of West Virginia. He bases this argument on the fact he did not qualify for civil service protection or satisfy the requisites of the "part-time employee" classification for coverage under the Public Employees Insurance Act or the Public Employee Retirement System. Defendant rather characterizes his service as that of a "contractor" who presumably had none of the responsibilities otherwise attendant to state employment.

Defendant's argument in this regard is disingenuous and specious. The West Virginia Governmental Ethics Act, W.Va.Code §§ 6B–1–1 to –5, defines "public employee" as "any full-time or part-time employee of any governmental body or any political subdivision thereof...." W.Va.Code § 6B–1–3(h). That definition plainly and of necessity encompasses the definition of "employee": "any person in the service of another under any contract of hire, whether express or implied, oral or written, where the employer or an agent of the employer or a public official has the right or power to control and direct such person in the material details of how work is to be performed and who is not responsible for the making of policy nor for recommending official action." W.Va.Code § 6B–1–3(b).[14]

As the Government notes, reality and plain statutory wording compel the conclusion that when the Legislature sought to promote integrity and impartiality in governmental process by enacting the Ethics Act, it did not intend to exempt from the Act's constraints those individuals, such as Defendant, whose terms of service may have lacked a few emoluments of state employment. Extended to its logical conclusion, Defendant's argument would provide any state official a ready means of evading the Act by simply hiring a "contractor" to carry out prohibited activities.

The Government also points out and has submitted documentation showing Defendant in the past routinely assumed he was a public employee. Under oath, he has described himself as a salaried state employee receiving between $24,000 and $25,000 a year for his services. He signed an "Employee Affidavit," two "Conflict of Interest Statements," and an "Employee Drug Awareness Certification" all attesting he was a state employee. Defendant appears to have become anxious to renounce his status as a state employee only when the Government accused him of violating the duties and accountability imposed by his state employment.

The Court concludes regardless of whether Defendant received as Lottery attorney the range of employee benefits afforded some state employees, he unquestionably functioned as a compensated state employee. As such, Defendant's behavior was constrained by the Ethics Act and he was subject to any other duties applicable to West Virginia public employees.

The Government contends Defendant's duty of honest service arose from: (1) his ethical responsibilities as an attorney for the Lottery; (2) his obligations under the Ethics Act; and (3) his inherent responsibilities as a West Virginia public employee. To support the validity of the indictment, the Court need only find at least one of these duties existed, so that the allegations asserted by the Government properly accuse Defendant of violating a fiduciary duty to his employer. *See supra* § III.

■ Having concluded Defendant was a public employee and therefore subject to the provisions of the state Ethics Act, the Court concludes Defendant had a duty under the Act to refrain from disclosing confidentialities of which he became aware by virtue of his position as Lottery attorney. The Act provides "[n]o present or former public official or employee may knowingly and improperly disclose any confidential information acquired by him or her in the course of his or her official duties nor use such information to

14. The Act also reaches "public officials" who are responsible for making policy and taking official action. W.Va.Code § 6B–1–3(i).

further his or her personal interests or the interests of another person." W.Va.Code § 6B–2–5(e). This statute leaves no room for doubt Defendant had notice that misuse of confidential information he gained as Lottery attorney would violate the Ethics Act.[15] The factual predicate set forth in the indictment, if proven, would establish Defendant violated his duty under the statute.

This Court holds as well Defendant assumed a duty to provide the citizens of West Virginia with his honest services when he accepted a position in their employ. This duty arose not by virtue of the particular position Defendant occupied within state government, but rather simply by the fact he occupied a position within state government. The intangible right to honest services protects "any employer or other entity which engages a person to perform services." *United States v. Piccolo*, 835 F.2d 517, 520 (3d Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). A public employee owes a fiduciary duty to the public.

The Court finds it difficult to accept that Defendant is unable to locate "any definition or designation of specific acts" which would violate this duty of honest services. Courts have convicted defendants for depriving government of honest services for hundreds of years. *See, e.g., Trial of Valentine Jones*, 31 How.St.Tr. 251 (1809) (cited in *McNally v. United States*, 483 U.S. 350, 371, 107 S.Ct. 2875, 2887, 97 L.Ed.2d 292 (1986) (Stevens, J., dissenting)). As Justice Stevens noted in his *McNally* dissent:

In the public sector, judges, State Governors, chairmen of state political parties, state cabinet officers, city aldermen, Congressmen and many other state and federal officials have been convicted of defrauding citizens of their right to honest services of their governmental officials. In most of these cases, the officials have secretly made governmental decisions with the objective of benefiting themselves or promoting their own interests, instead of fulfilling their legal commitment to provide the citizens of the State or local government with their loyal service and honest government. *McNally*, 483 U.S. at 362–63, 107 S.Ct. at 2882–83 (Stevens, J., dissenting).[16]

Defendant is directed to the cases catalogued by Justice Stevens for guidance in determining what sort of behavior violates an employee's duty of honest service. No court or legislature could possibly set forth affirmatively every instance of indiscretion on the part of a public employee which might conceivably violate his or her duty of honest service. Clearly, persons subject to the duty must execute their responsibilities in accordance with the law, and may not attempt to reach goals through unlawful, fraudulent, or dishonest means.

Concrete parameters outlining the duty of honest service should not be necessary in order for a person to be charged with violating this duty. The concept of the duty of honest service sufficiently conveys warning of the proscribed conduct when measured in terms of common understanding and practice.[17] The Constitution requires no more. *United States v. Petrillo*, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). The fact that there may arise marginal cases where it is difficult to determine on which side of the line a particular factual situation falls is "no sufficient reason to hold the language too ambiguous to define a criminal offense." *Petrillo*, 332 U.S. at 7, 67 S.Ct. at 1542 (quoting *Robinson v. United States*, 324

---

**15.** Even if West Virginia had no such provision in its Ethics Act, "[i]t is well established, as a general proposition, that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom." *Carpenter v. United States*, 484 U.S. 19, 27–28, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (quoting *Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 80, 248 N.E.2d 910, 912 (1969)).

**16.** In a footnote, Justice Stevens cited numerous cases in which public employees were convicted of defrauding citizens of their right to the honest services of their government officials. *McNally*, 483 U.S. at 362–63 n. 1, 107 S.Ct. at 2883 n. 1 (Stevens, J., dissenting).

**17.** *See, e.g., Weiss v. United States*, 122 F.2d 675, 681 (5th Cir.1941): "The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity."

U.S. 282, 285–86, 65 S.Ct. 666, 668–69, 89 L.Ed. 944 (1944)). To require there be a more definite delineation of conduct violating the duty of honest service "would strain the requirement for certainty in criminal law standards too near the breaking point." *Petrillo*, 332 U.S. at 7, 67 S.Ct. at 1541. Defendant's assertion the indictment should be dismissed on this ground too must fail.

## V.

For these reasons, the Court **DENIES** Defendant's motions to dismiss.