**UNITED STATES of America**

v.

**H. Leonard BERG, Grimm DePanicis, Leon Lisbona, and Solomon Schwartz, Defendants.**

**No. 84 CR 190(S-3).**

United States District Court, E.D. New York.

April 5, 1989.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Larry H. Krantz, and Ira Belkin, Asst. U.S. Attys., for the Government.

J. Jeffrey Weisenfeld, New York City, for H. Leonard Berg.

Lawrence A. Dubin, New York City, for Solomon Schwartz.

Paul A. Goldberger, New York City, for Leon Lisbona.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

Count One of the indictment charges defendants Berg, Lisbona and Schwartz with forming a RICO enterprise to make money from selling and exporting arms, ammunition and articles of war. In the course of the enterprise, defendants engaged in four illegal arms-trading schemes: (1) the sale and shipment of more than 1300 night vision goggles to Argentina during the Falkland Islands War with Great Britain, (2) an attempt to export firearms and ammunition to Iraq, (3) an agreement to ship 400 night vision goggles to the Soviet Union, and (4) an attempt to ship a planeload of arms and ammunition to Poland. The enterprise was conducted through a pattern of racketeering which consisted of (1) obtaining night vision goggles for the Argentinean sale by wire fraud (Count Two), (2) obtaining an arms export license for the Iraqi sale by wire fraud (Count Five) and (3) obtaining an arms export license for the Polish sale by wire fraud (Count Eleven).

Count Two charges that, as part of the Argentinean sale, defendants Berg, Lisbona and Schwartz, in violation of 18 U.S.C. § 1343 (1982), obtained night vision goggles from Litton Industries by falsely representing, over interstate wires, that proper arms export licenses would be obtained before the goggles were shipped outside the United States. Count Three charges that Berg, Lisbona, Schwartz and Grimm DePanicis exported the goggles to Argentina without a license, in violation of Arms Export Control Act § 38, 22 U.S.C. § 2778(b)(2) & (c) (1982 & Supp. IV 1986).

Count Four charges that Berg, Lisbona and Schwartz conspired, in violation of 18 U.S.C. § 371 (1982), to export arms illegally to Iraq. Count Five charges that Berg, Lisbona and Schwartz, in violation of 18 U.S.C. § 1343, obtained an arms export license for the Iraqi sale from the Munitions Control Board by falsely representing, over interstate wires, that the end-user of the arms would be "Holland Arms" and the arms were required for "Resale," when in truth the end-user was Iraq and the required use was supplying the Iraqi National Police. Count Six charges these same misrepresentations constituted false statements to a Federal agency in violation of 18 U.S.C. § 1001 (1982). Count Seven charges defendants with using the arms license, which contained false statements and material omissions, to ship arms in violation of 22 U.S.C. § 2778(b)(2) & (c).

Count Eight alleges that Berg, DePanicis, Lisbona and Schwartz conspired, in violation of 18 U.S.C. § 371, to export four hundred night vision goggles to the Soviet Union by way of West Germany and to ship one sample goggle to West Germany in violation of the Arms Export Control Act, 22 U.S.C. § 2778. Count Nine charges that Berg, Depanicis, Lisbona and Schwartz exported one night vision goggle to West Germany without a license, in violation of 22 U.S.C. § 2778(b)(2) & (c).

Count Ten alleges that, as part of the scheme to export arms to Poland, Berg, Lisbona and Schwartz conspired, in violation of 18 U.S.C. § 371, to file a false application for an arms export license and to use the license so obtained to export arms and ammunition. Count Eleven alleges that Berg, Lisbona and Schwartz, in violation of 18 U.S.C. § 1343, obtained the license from the Munitions Control Board by falsely representing, over interstate wires, that the end-user of the arms would be a Mexican government agency, when in truth defendants knew the arms were to be shipped to Poland. Count Eleven also alleges that Berg and Schwartz attempted to obtain a shipment of arms and ammunition detained by the United States Customs Service by falsely representing to the Customs

Service, over interstate wires, that the shipment was bound for Mexico. Count Twelve alleges that Berg, Lisbona and Schwartz violated 18 U.S.C. § 1001 by making false statements to the Munitions Control Board in the application for the arms export license. Count Thirteen charges that defendants violated 22 U.S.C. § 2778(b)(2) & (c) by using the arms export license containing false statements and material omissions to ship arms. Count Fourteen charges that Berg and Schwartz obstructed the administration of law in administrative proceedings of the United States Customs Service by making false statements and instructing others to make false statements in violation of 18 U.S.C. § 1505 (1982).

On June 22, 1988, Berg and Schwartz were found guilty on all counts. Lisbona was found guilty on Counts One through Thirteen. Depanicis was found guilty on Counts Eight and Nine.

Defendants Berg, Schwartz and Lisbona have jointly moved for judgment of acquittal on several counts. The motions will be considered in sequence.

### I.

Defendants challenge their wire fraud convictions on Count Two because the proof at trial failed to establish that defendants had the requisite intent to defraud Litton Industries. *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987).

Defendants' motion is nearly identical to their challenge to Count Two prior to trial. The earlier motion was denied by a Memorandum and Order dated February 11, 1988, 710 F.Supp. 434 (E.D.N.Y.1988). In particular, it was held that defendants' intent to defraud was sufficient if the fraud went to the basis of the bargain with Litton. "If Litton's sale was conditioned on the false assurances [that defendants

would obtain a proper arms export license], the false assurances went to the basis of the bargain." Memorandum and Order 710 F.Supp. at 437.

At trial, Dr. Gerald Pokorny, the Litton executive in charge of the division that manufactures night vision products, testified that without defendants' written assurances that they would not illegally export Litton's products, Litton would never have sold its products to defendants. Tr. 1070, 1072.

Defendants' fraud allowed them to obtain property from Litton which they otherwise could not obtain. The misrepresentations were thus the very basis for the sale and not mere collateral considerations. *See Starr*, 816 F.2d at 98. The evidence establishes defendants' intent to defraud.

The motion is denied.

### II.

Defendants move for acquittal on Counts Five and Eleven because the export licenses obtained by fraud are not property within the meaning of the wire fraud statute.

### A.

The wire fraud statute prohibits the use of interstate wires for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses...." 18 U.S.C. § 1343 (1982). Until the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), every Court of Appeals to consider the question had read the language of the wire and mail fraud statutes [1] in the disjunctive—that is, a conviction required proof of either of a scheme to defraud *or* a scheme for obtaining money or property by means of false or fraudulent pretenses.[2] Proof of a scheme to de-

---

**1.** Since the language of the wire and mail fraud statutes is identical, similar analysis applies to both. *United States v. Carpenter*, 484 U.S. 19, —— n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987).

**2.** *See, e.g., United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913,

103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir.), *cert. denied*, 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Frankel*, 721 F.2d 917, 920 (3d Cir.1983); *United States v. States*, 488 F.2d 761, 764 (8th Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974); *United States v. Halbert*, 640 F.2d

fraud did not require proof of actual loss of money or tangible property.[3] Cases such as those cited in the notes embodied what came to be known as the intangible rights doctrine.

Prosecutions for schemes to obtain licenses by fraud were sustained on the same theory. In *United States v. Castor,* 558 F.2d 379, 382–83 (7th Cir.1977), *cert. denied,* 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978), defendants allegedly had filed applications containing false information in order to obtain some of a limited number of liquor licenses available from the State of Indiana. The District Court dismissed the mail fraud charges against defendants holding that, since the licenses were not property under Indiana law, the indictment did not charge a scheme having as its object the obtaining of money or property. The Court of Appeals reversed. "[T]he district court's construction of 18 U.S.C. § 1341 has been previously rejected by this Court [in two prior cases]. In both cases we held that the mail fraud statute is not limited to fraudulent schemes that contemplate the actual loss of money or property." *Castor,* 558 F.2d at 379 (citations omitted). *See also United States v. Green,* 577 F.Supp. 935, 936 (N.D. Cal.1984) (obtaining driver's license by fraud; conviction upheld under intangible rights doctrine); *cf. United States v. Haimowitz,* 725 F.2d 1561, 1567–71 (11th Cir. 1984) (obtaining liquor license by fraud; conviction upheld).

In *McNally,* the Supreme Court overturned this line of cases and vacated the convictions of James Gray and Charles McNally, who had been convicted of devising a scheme to defraud the citizens of Kentucky of their right to have the Commonwealth's affairs conducted honestly. The Court reasoned that, while the mail fraud statute clearly referred to property rights, it made no mention of the intangible right to good government. *McNally,* 483 U.S. at 357–58, 107 S.Ct. at 2880. The sparse legislative history, to the extent it revealed anything, indicated the mail fraud statute "had its origin in the desire to protect individual property rights, and that any benefit that the Government derives from the statute must be limited to the Government's rights as a property holder." 483 U.S. at 358–59 n. 8, 107 S.Ct. at 2881 n. 8. Although the Court noted that the contrary interpretation employed by the Courts of Appeals was "arguable," it was persuaded that Congress intended only to prevent schemes to obtain property or money. "[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.... If Congress desires to go further, it must speak more clearly than it has." 483 U.S. at 359–60, 107 S.Ct. at 2881.

---

1000, 1007 (9th Cir.1981); *United States v. Scott,* 701 F.2d 1340, 1343–44 (11th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983); *United States v. Classic,* 35 F.Supp. 457 (E.D.La.1940).

**3.** *See, e.g., United States v. Silvano,* 812 F.2d 754 (1st Cir.1987) (honest services of local government officials); *United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (right to have affairs of local government conducted honestly); *United States v. Bronston,* 658 F.2d 920 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982) (concealing material information from client); *United States v. Von Barta,* 635 F.2d 999 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981) (same); *United States v. Clapps,* 732 F.2d 1148 (3d Cir.), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984) (right to

honest election); *United States v. Mandel,* 591 F.2d 1347, 1358 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (honest and faithful services of governor); *United States v. Curry,* 681 F.2d 406, 411 (5th Cir. 1982) (right to correct financial disclosure from political action committee chairman); *United States v. States,* 488 F.2d 761 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974) (fraudulently influencing election); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974) (honest services of governor); *United States v. Brown,* 540 F.2d 364 (8th Cir.1976) (right to disinterested conduct of Building Commissioner); *United States v. Louderman,* 576 F.2d 1383 (9th Cir.). *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978) (right of privacy); *United States v. Girdner,* 754 F.2d 877 (10th Cir.1985) (right to honest election).

On November 18, 1988, Congress passed The Anti–Drug Abuse Act of 1988, which added a new section, 18 U.S.C. § 1346, to the mail fraud chapter of the criminal code:

> For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to defraud another of the intangible right of honest services.

Pub.L. No. 100–690, § 7603, 102 Stat. 4508 (1988). On its face, section 1346 clearly overturns the *McNally* decision. Representative John Conyers, the floor sponsor of this particular amendment, submitted comments on its purpose. *See* 134 Cong. Rec. H11251 (daily ed. Oct. 21, 1988). Hearings before Rep. Conyers' Subcommittee on Criminal Justice revealed that many significant political corruption prosecutions had been dismissed or overturned as a result of *McNally*. "[C]ases involving bribery, money laundering, election fraud and licensing fraud have been dismissed because there was no monetary loss to any victim." *Id.* Rep. Conyers then gave a capsule of the law before *McNally*, citing the *Margiotta* case in particular, and stated,

> This amendment restores the mail fraud provision to where that provision was before the McNally decision. The amendment also applies to the wire fraud provision, and precludes the *McNally* result with respect to that provision.... Thus, it is no longer necessary to determine whether or not the scheme or artifice to defraud involved money or property.

*Id.*

Section 1346, then, may be viewed as restoring the law to its state prior to the *McNally* decision.

A court must apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. *Bradley v. School Board of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The Court in *Bradley* expressly rejected the proposition that a change in law should be applied to a pending case only when it was the clear intention of legislature that this be done. *Id.* at 715, 94 S.Ct. at 2018.

In addition, the Second Circuit has held that where Congress clearly indicates its intention to reject a recent Supreme Court interpretation and restore the law to its former state, retroactive application of a newly enacted statute is appropriate. *See Mrs. W. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987); *Leake v. Long Island Jewish Medical Center,* 695 F.Supp. 1414, 1417 (E.D.N.Y.1988), *aff'd,* 869 F.2d 130 (2d Cir. 1989). The Court recognizes that while the comments of a sponsor are not determinative of legislative intent, *Weinberger v. Rossi,* 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 1517 n. 15, 71 L.Ed.2d 715 (1982), Congressional intent may be inferred from statements of a sponsor on the floor, *see Regents of the University of California v. Public Employment Relations Board,* — U.S. ——, 108 S.Ct. 1404, 1409, 99 L.Ed.2d 664 (1988). Here, Rep. Conyers comments are the sole evidence of Congressional intent, other than the text of the amendment. No House or Senate Report was produced, nor did any other Congressman speak on section 1346. The Court is persuaded that both the text of section 1346 and the uncontradicted comments of its floor sponsor indicate Congress's intent to overrule *McNally* and restore the law to its state prior to *McNally*.[4] Given this clear intention and Congress's swift action in reversing *McNally*, it can be inferred that Congress intended section 1346 to be applied retroactively. *Leake,* 695 F.Supp. at 1417.

---

**4.** We also note that to the extent that the courts in *Margiotta* and related cases were interpreting the mail and wire fraud statutes in furtherance of Congress's intent, section 1346 may be viewed as Congress's attempt to restore and clarify the original intent behind the wire fraud statute. The Supreme Court has repeatedly held that a subsequent legislature declaring the intent of an earlier statute is entitled to significant weight. *See NLRB v. Bell Aerospace,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). This is especially appropriate where, as here, the legislative history of the original mail fraud statute is sparse and the intent of the words admittedly unclear. *Seatrain Shipbuilding v. Shell Oil,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980).

Regardless of its implicit or explicit intention, however, Congress may not pass an *ex post facto* law. U.S. Const. art. I, § 9. The *ex post facto* prohibition forbids Congress from punishing any act which was not punishable at the time it was committed. *Weaver v. Graham*, 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981). The prohibition is based on the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties. *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 992, 51 L.Ed.2d 260 (1977). "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver*, 450 U.S. at 30, 101 S.Ct. at 965.

Congress, in enacting 18 U.S.C. § 1346, expanded the scope of criminal liability beyond that which obtained after June 24, 1987, the date of the *McNally* decision. There is no doubt that a person acting after *McNally* was decided could not be convicted on the basis of section 1346.

Defendants in the present case acted in different circumstances. Defendants acted between April 1982 and March 1984. As noted above, at that time, every Circuit that had considered the question had held that the wire fraud statute proscribed schemes to defraud persons of "intangible" rights like the right to the honest services of local government officials. *See supra* notes 2 & 3. While the Second Circuit never decided whether a scheme to obtain a license by fraud fell within the scope of the mail fraud statute, such conduct was clearly proscribed in other Circuits. *See United States v. Haimowitz*, 725 F.2d 1561 (11th Cir.1984) (liquor license); *United States v. Castor*, 558 F.2d 379, 382–83 (7th Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978) (liquor store permits); *United States v. Green*, 577 F.Supp. 935 (N.D.Cal.1984) (driver's license). The Court is persuaded that, according to the binding legal authority of that time, defendants' conduct would have been proscribed by the wire fraud statute. Defendants did not rely on *McNally* when devising their schemes to defraud. They may not argue that they were deprived of fair warning by a decision rendered years later.

Thus, while we recognize that retroactive application of law is more difficult and not always appropriate in criminal cases, here, where defendants had notice that they were committing a crime, and where the legislature clearly intended to overrule *McNally*, we are compelled to apply the amendment to the mail and wire fraud statute retroactively.

Defendants wire fraud convictions, therefore, must stand.

### B.

■ Application of 18 U.S.C. § 1346 notwithstanding, the Court believes defendants devised a scheme to obtain property, as that term has been construed in *McNally* and its progeny.

Shortly after the Supreme Court decided *McNally*, it decided *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed. 2d 275 (1987). The Court there held that the mail and wire fraud statutes protected not only tangible forms of property, but certain intangible forms as well. In particular, it held that the Wall Street Journal's interest in the confidentiality and timing of its columns was a property right protected by the mail and wire fraud statutes.

The Second Circuit applied the reasoning of *McNally* and *Carpenter* in *United States v. Evans*, 844 F.2d 36 (2d Cir.1988). In *Evans*, defendants were charged with devising a scheme to obtain property, to wit, the U.S. Defense Articles listed in the indictment, and money, to wit, commissions for themselves from the sale of the U.S. Defense Articles. The arms in question had been manufactured in the United States or under license from the United States but were now in the possession of a foreign country. Defendants planned to arrange sale of the arms to Iran by deceiving the United States about the destination of the arms in order to obtain necessary permission for the transaction. *See* 22 U.S. C. § 2753(a)(2) (1982 & Supp. IV 1986).

The Court ruled that defendants' convictions could not stand because there was no showing that the Government had some property interest in the arms or money. *Evans*, 844 F.2d at 40. It rejected the theory that the Government's right to prevent the transfer of arms between foreign powers constituted a property right for purposes of the wire fraud statute. While the right to control the alienation of property might, in certain circumstances, constitute a property right protected by the fraud statutes, such was not the case in *Evans*. *Id.* at 41. The Court noted first that the right to restrain the transfer of weapons between foreign countries had not been recognized as a property right in other contexts. Second, it focused on the Government's lack of a possessory remedy for violations of restrictions on transfer. This lack of a remedy akin to replevin distinguished the Government's rights from the rights of holders of non-possessory estates at common law. Finally, the Court found that the background of international relations and human rights law against which foreign arms transactions occurred was sufficiently different from the economic background of property rights to make application of principles in one sphere impractical in the other.

It must be noted first that the property in *Evans* was in the possession of a foreign sovereign. By contrast, the property at issue here is a license, the power to grant which remains solely with the United States, and the paper embodiment of which is in the possession of the Government until issued. Further, the licenses regulate transfers of arms originating in the United States. The difficult and delicate issues presented by interference in arms transfers between two foreign nations are not implicated in as great degree in the case of arms exported from the United States.

Second, unlike the rights at issue in *Evans*, licenses have been regarded as property in other contexts. As this Court noted in an earlier opinion, it is firmly established that licenses are property in the hands of the license holder. *See* Memorandum and Order 710 F.Supp. at 437; *see also Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license); *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (same). "Once licenses are issued ... their continued possession may become essential in the pursuit of a livelihood." *Bell*, 402 U.S. at 539, 91 S.Ct. at 1589. That observation is amply demonstrated by the facts of the present case. Had the arms export licenses been properly issued, defendants would have profited by thousands of dollars. The export licenses were certainly valuable property to the defendants.

To hold, as some courts have, *see United States v. Murphy*, 836 F.2d 248 (6th Cir. 1988), that such valuable property vanishes when held in the hands of the issuer strikes the Court as preposterous. As our learned brother Glasser has recently noted, licenses and all other forms of government largess traditionally were considered property of the Government. *United States v. Turoff*, 701 F.Supp. 981, 989–90 (E.D.N.Y.1988) (citing Reich, *The New Property*, 73 Yale L.J. 733, 778 (1964)). "The salutary fact that, in modern times, courts have recognized the property rights of licensees need not blind us to the equally compelling fact that licenses, like other forms of public largess, originate in the state and are 'public property,' in the first instance." 701 F.Supp. at 990.

The third and most important distinction between this case and *Evans* is the Government's possessory remedy for illegal arms exports. The Government has the right to seize and forfeit arms if there is probable cause to believe that arms are intended to be, are being, or have been exported or removed in violation of law. 22 U.S.C. § 401 (1982). Further, the right to forfeit arms attaches the moment a person intends or attempts to illegally ship arms. By concealing the nature of their illegal arms sales through false export license applications, defendants attempted to deprive the Government of its right to repossess arms shipped in violation of law. Thus, the Government's interest in the arms could be said to attach the moment defendants applied for the arms export licenses. The defendant's scheme thus resembled a

scheme to deprive the Government of a chose in action—a valuable, intangible property right. *See United States v. Porcelli*, 865 F.2d 1352, 1361 (2d Cir.1989).

For the reasons stated above, the Court believes defendants acted in order to defraud the United States of a valuable property right and that their convictions on Counts Five and Eleven must stand.

### III.

Defendants move for acquittal on Counts Ten through Fourteen because the Court erred in refusing to instruct the jury on defendants' proffered authorization defense.

The Court sees no reason to depart from its previous ruling in *United States v. Berg*, 658 F.Supp. 253 (E.D.N.Y.1987). It was held there that the DIA has no actual authority to authorize conduct that violates a statute of the United States and, further, that defendants may not claim that the DIA had apparent authority to do so. There was no error in refusing to instruct on an invalid defense.

The motion is denied.

### IV.

■ Defendants move for acquittal on all counts because the Court instructed the jury on conscious avoidance, yet limited defendants' attempts during cross-examination to show custom and usage in the arms industry.

As the Court ruled at trial, the custom of other arms dealers in complying with arms export laws is irrelevant to the state of mind of Messrs. Berg, Lisbona and Schwartz, and whether they consciously avoided learning the criminal nature of their actions. The evidence was properly excluded under Fed.R.Evid. 401 & 402.

The motion is denied.

### V.

Defendants argue that if the wire fraud charges were improperly before the jury, the verdict on balance of the counts must be set aside because the presence of the wire fraud counts prejudiced the jury with respect to the other counts.

Since we have held that the wire fraud charges were proper, this motion is moot.

### VI.

■ Last, defendants Berg and Schwartz move for acquittal on Count Fourteen because the Customs Service interview with Berg and Schwartz was not an administrative proceeding within the meaning of 18 U.S.C. § 1505 (1982). They contend that since one purpose of the interview was to obtain evidence for use in criminal proceedings, the proceeding was not administrative.

The cases clearly hold that agency investigations, including criminal investigations, are proceedings within the meaning of section 1505. *United States v. Browning*, 572 F.2d 720, 724 (10th Cir.), *cert. denied*, 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978) (Customs Service investigation into pricing and importing practices of arms importing company held an agency proceeding); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir.1976) (an administrative investigation is a proceeding within the meaning of section 1505); *United States v. Persico*, 520 F.Supp. 96, 101 (E.D.N.Y.1981) (IRS investigation into criminal activity held a "proceeding" within meaning of section 1505).

The motion is denied.

### CONCLUSION

For the reasons stated above, defendants motions must be denied. Defendants should appear for sentence on May 12, 1989 at 2:00 p.m.

SO ORDERED.