**UNITED STATES of America,**

v.

**Angelo PACCIONE, Anthony Vulpis, John McDonald, A & A Land Development, August Recycling, Inc., National Carting, Inc., Stage Carting, Inc., New York Environmental Contractors, Inc., Rosedale Carting, Inc., and Vulpis Brothers, LTD., Defendants.**

**No. SSS 89 Cr. 446 (CBM).**

United States District Court, S.D. New York.

Aug. 13, 1990.

Otto G. Obermaier, U.S. Atty., S.D. of N.Y. by Elliot Peters, Jeffrey B. Sklaroff and Kevin Ford, Asst. U.S. Attys., New York City, for the U.S.

Newman & Schwartz by Gustave Newman, and Deborah Schwartz, New York City, for defendants Paccione, A & A Land Development, August Recycling, Inc., National Carting, Inc., Stage Carting, Inc., and New York Environmental Contractors, Inc.

Benjamin Brafman, P.C. by Benjamin Brafman, New York City, for defendant Vulpis.

Robert Kasanof by Robert Kasanof, and Edward Chikofsky, New York City, for defendant McDonald.

Larossa, Mitchell & Ross by Michael Ross, New York City, for defendants Rosedale Carting, Inc. and Vulpis Bros., Ltd.

## OPINION

MOTLEY, District Judge.

On May 8, 1990, the Government rested its case. Defendants then moved for a judgment of acquittal on all counts pursuant to Fed.R.Crim.P. 29(a). After hearing the arguments of counsel on May 8, 1990, the court orally denied defendants' motions for a judgment of acquittal on all counts with Opinion to follow. This Opinion sets forth the court's reasons for its ruling. It also sets forth the court's finding—pursuant to *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)—with respect to the use of co-conspirator statements as evidence against each defendant.

## DISCUSSION

In order to withstand a defendant's motion for a judgment of acquittal on a particular count charged in an indictment, the Government must have introduced evidence in its direct case "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt" on each and every element of the charged offense. *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984).

The Government must also show, by a preponderance of the evidence, that the defendant knowingly and wilfully became a member of and participated in the conspiracy charged in the indictment in order to permit co-conspirator statements to be used as proof against a particular defendant pursuant to Fed.R.Evid. 801(d)(2)(E). *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). "[A] court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). The court is permitted "to evaluate these statements for their evi-

dentiary worth as revealed by the particular circumstances of the case." *Id.* at 180, 107 S.Ct. at 2781.

On the basis of the evidence outlined in this Opinion, the court finds that the Government introduced sufficient evidence in its direct case upon which a reasonable jury could find each defendant's guilt beyond a reasonable doubt as to each count charged in the indictment.[1] These same facts are also sufficient to show that the defendants unlawfully, knowingly and wilfully participated in the RICO conspiracy charged in Count Two of the indictment.

When the indictment charges an offense as both a racketeering act and a substantive count, the court will discuss each of these concurrently. The court now sets out the Government's evidence introduced at trial supporting each charge alleged in the indictment.

## I. COUNT I—RICO

■ Count One of the indictment charges each defendant with unlawfully, wilfully, and knowingly conducting and participating in the affairs of a racketeering enterprise through a pattern of racketeering activity including mail and wire fraud in violation of 18 U.S.C. Sec. 1962(c). In order to prove that a defendant is guilty of RICO as charged in Count One, the Government must establish, beyond a reasonable doubt, each of the following essential elements of the crime: (1) that an enterprise as alleged in the indictment exists; (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant was associated with or employed by the enterprise; (4) that the defendant unlawfully, wilfully, and knowingly engaged in a pattern of racketeering activity by committing, or aiding and abetting the commission of, at least two acts of racketeering; and (5) that the defendant conducted or participated in the conduct of the enterprise's affairs through that pattern of racketeering activity.

1. In general, this Opinion will address only those counts of the indictment of which a defendant was found guilty and those racketeering

### a. Existence of the Enterprise/Effect on Interstate Commerce

The court acknowledges that the first two elements of a RICO offense that the Government must establish beyond a reasonable doubt apply generally to each defendant: the existence of the enterprise as defined by the RICO statute, 18 U.S.C. Sec. 1961(4), and the effect of that enterprise on interstate or foreign commerce.

■ According to the RICO statute, any "group of individuals [who are] associated in fact although not a legal entity" may constitute an "enterprise." 18 U.S.C. Sec. 1961(4). This includes an enterprise which consists of individuals, corporations, and partnerships as alleged in the indictment. *United States v. Paccione*, 738 F.Supp. 691 (S.D.N.Y.1990), citing *United States v. Huber*, 603 F.2d 387, 393–94 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (group of corporations constituted "association in fact" enterprise). In addition, a single entity can be both a RICO "person" and one of the members of the RICO "enterprise." *Cullen v. Margiotta*, 811 F.2d 698, 729–30 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). The fact that the entities named in the indictment as "persons" are alleged to be constituent members of the same enterprise does not invalidate the RICO counts. *United States v. Paccione*, 738 F.Supp. 691 (S.D.N.Y. 1990).

■ Proof as to the existence of the enterprise charged in the indictment would include facts showing the defendants to be part of an ongoing organization, formal or informal, and that the enterprise functions as a continuing operation with a core of personnel who function as a continuing unit. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see also, U.S. v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc), *cert. denied*, —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

acts which a defendant was found to have committed.

The indictment charges that the defendants were part of a racketeering enterprise whose purposes included the enrichment of the individual defendants and their affiliated partnership and corporations through the operation of an illegal landfill and the disposal of waste materials in violation of federal, state, and local law. In pursuit of its goal, the indictment charges that the enterprise engaged in various illegal activities including avoiding federal, state, and city regulations relating to the operation of a landfill and the disposal of waste materials, and defrauding New York State and City of licenses, licensing fees, and dumping fees. In addition, the indictment charges that the enterprise defrauded generators of medical waste by charging them the rates required for the lawful transfer, storage, and disposal of such waste which was higher than the rates actually incurred by transferring, storing, and disposing of the waste unlawfully. In doing so, the indictment alleges, the enterprise exposed these waste generators to potential civil and criminal penalties.

The existence of the alleged enterprise is supported by testimony of government officials who had dealings with defendants Paccione and Vulpis, acting on behalf of the partnership and corporate defendants, as well as the testimony of a government investigator who observed the operations of the defendants.

Allison Lewis–Smith, an official at the New York City Department of Sanitation ("DOS") whose responsibilities included issuing letters of acknowledgement for clean fill grading operations, testified that defendants Paccione and Vulpis filed an application for a clean fill grading permit in April 1988 on behalf of defendant A & A Land Development, a partnership which was equally owned by Paccione and Vulpis. Lewis–Smith issued a letter of acknowledgement to A & A Land Development for a clean fill grading operation on a parcel of land owned by Kenneth I. Wilpon as Agent, Inc. However, according to the testimony of numerous Government witnesses, Paccione and Vulpis instead used this permit for the disposal of waste on the property owned by CSX Transportation, Inc.

In addition, there was evidence that Paccione and Vulpis, also on behalf of A & A Land Development, caused permits to be issued by the Department of Transportation ("DOT"). Lynn Fealy, permit supervisor at the DOT, testified that Vulpis submitted several applications for street opening permits which showed the purpose of the permit as placing fill. These street opening permits were approved and issued to Vulpis, Paccione, and A & A Land Development. Again, according to numerous Government witnesses, the defendants used these street opening permits in the operation of the landfill.

Evidence that the defendants August Recycling, Inc. ("August"), National Carting, Inc. ("National"), Stage Carting, Inc. ("Stage"), Rosedale Carting, Inc. ("Rosedale"), and Vulpis Brothers, Ltd. ("Vulpis Brothers") were also members of the enterprise can be found in testimony that these companies disposed of waste materials at the A & A landfill site. It is undisputed that August, National, and Stage are owned by Angelo Paccione and that Anthony Vulpis is a co-owner of Rosedale and Vulpis Brothers. Peter Lizzio, an investigator of environmental crimes for the New York City Department of Investigations, testified that during his surveillance of the Arlington Yard site from May 1988 to September 1988, he regularly observed numerous trucks belonging to these defendant corporations dumping at the landfill. The videotapes and photographs taken by Lizzio's team support his testimony.

The existence of the enterprise is further supported by evidence of the working relationship between the defendant companies of Paccione and Vulpis. For example, while Coney Island Hospital entered into an agreement with National, one of Paccione's companies, to have their medical waste removed, the delivery receipts introduced into evidence indicate that Rosedale, one of Vulpis' companies, was the actual shipper of the waste.

The evidence outlined above is sufficient to support an inference that the defendants Paccione and Vulpis and their affiliated

defendant partnership and corporations were in fact associated as an ongoing enterprise with a common purpose shown by a continuing operation and core of personnel.

■ As to the effect of the enterprise's activities on interstate commerce, the Government has introduced evidence that there were numerous phone calls and letters from defendants Paccione, Vulpis and Weiss on behalf of A & A Land Development to representatives of CSX Realty Corporation, a company which conducts business nationwide, while these representatives were in the CSX Realty offices in Richmond, Virginia. As a result of these correspondences, the CSX representatives took a number of flights from their base office in Virginia to Newark Airport in New Jersey, where they were then brought to the Staten Island landfill site to discuss matters affecting CSX business. According to the evidence in support of racketeering acts 3d and 4a–i, discussed below, the enterprise schemed to defraud CSX Transportation, a company headquartered in Florida, of the value of its New York property.

Moreover, in a tape recorded meeting with Allison Lewis–Smith of the DOS, Paccione said that the defendants were transporting the medical waste they picked up from generators to a facility in South Carolina. However, the testimony of numerous Government witnesses indicates that most of the waste was never transported to this facility. Instead, according to those witnesses, the defendants transported the waste to other locations, including the Staten Island landfill.

The remaining elements of a RICO offense—association with or employment by the enterprise; knowing, wilful and unlawful commission of a pattern of racketeering activity; and participation in the conduct of the enterprise's affairs through that pattern of racketeering activity—requires specific application as to each defendant.

b. *Association with the Enterprise*

■ The evidence set forth in this Opinion concerning the existence of the enterprise and the defendants' participation in it is also sufficient to support the inference that each of the defendants was aware of the existence of the criminal enterprise, was associated with and employed by the enterprise, and knowingly and intentionally participated in the enterprise's illegal activities.

c. *Pattern of Racketeering Activity*

■ The fourth element of a RICO offense which the Government must prove beyond a reasonable doubt is that a defendant unlawfully, wilfully, and knowingly engaged in a pattern of racketeering activity with the intention of furthering the goals of the enterprise. This is achieved by committing or aiding and abetting the commission of at least two acts of racketeering by common participants, victims, methods, purposes, or results and demonstrating a threat of continued racketeering activity, if not continuity in fact. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also, United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir.1989) (en banc), *cert. denied,* —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

The racketeering acts charged in the indictment all involve violations of either mail fraud or wire fraud on the part of the defendants. The statute that establishes the mail fraud offenses charged in Counts 3–12 and Racketeering Acts 1(a–e), 2, 3(a–e), 4(a–c), 5–11, 12(a–c), and 13–17 of the indictment is Title 18, United States Code, Section 1341 which provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the

place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [guilty of a crime].

The statute that establishes the wire fraud offenses charged in Racketeering Acts 3(f) and 4(d–i) of the indictment is Title 18, United States Code, Section 1343 which provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... in interstate ... commerce, any ... sounds for the purpose of executing such scheme or artifice, shall be [guilty of a crime].

 With respect to mail fraud, to convict a defendant of any particular mail fraud count or find a defendant guilty for the racketeering act of mail fraud, the Government must establish beyond a reasonable doubt three elements as to that charge.

The first element requires that there be a fraudulent scheme. This necessitates that at some point during the time period alleged in the charge, there existed a scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises. *U.S. v. Starr*, 816 F.2d 94, 98 (2d Cir.1987).

The second element requires that the defendant acted intentionally and deliberately in carrying out the fraudulent scheme. The defendant must have knowingly and wilfully devised or participated in the fraudulent scheme, with knowledge of its fraudulent nature and with the intent to defraud. *Id.*

The third and final element requires that the execution or attempted execution of this fraudulent scheme involved at least one use of the United States mails. The use of the mails, however, does not have to be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the fraudulent scheme. *Schmuck v. United States*, 489

U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).

To constitute mail fraud, the alleged victims must be deprived of some money or property rights, not just of an interest in honest services. *McNally v. United States*, 483 U.S. 350, 356, 107 S.Ct. 2875, 2879, 97 L.Ed.2d 292 (1987); *see also, United States v. Evans*, 844 F.2d 36 (2d Cir. 1988). These money or property rights include both tangible and intangible property interests. *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). The intangible property interests protected by the mail and wire fraud statute also include the right of a government agency to award permits, licenses, and contracts and, in turn, the right of the government agencies to the fees from these licenses, as held by this court in *United States v. Paccione*, 738 F.Supp. 691 (S.D.N.Y.1990); *see also, United States v. Biaggi*, 675 F.Supp. 790, 800–02 (S.D.N.Y.1987), *aff'd*, 909 F.2d 662, 687–88 (2d Cir.1990).

We now turn to the racketeering acts charged in the indictment.

*1. Racketeering Acts 1c—1e/Counts 5—7: Mail Fraud on Departments of Transportation and Sanitation*

 The indictment charges that defendants Paccione, Vulpis and their affiliated partnership and corporations engaged in a scheme to defraud the City of New York of money from licensing fees for the landfill operation at the Arlington Yard and from dumping fees to be derived from the lawful disposal of waste materials at the City-owned landfill at Fresh Kills. According to the indictment, the defendants accomplished this by making false and fraudulent representations to the DOT and DOS in order to obtain permission to operate the Arlington Yard landfill.

The mailings specifically alleged in the indictment in Racketeering Act 1c and 1d and simultaneously in Counts 5 and 6 are street opening permits No. 54468 and No. 54552, issued by the DOT and mailed to the DOS. The Government alleges that the defendants used these permits as a cover for the illicit disposal of waste at the Arlington Yard landfill and to avoid paying

licensing fees for the fill operation actually conducted.

Lynn Fealy, permit supervisor at the DOT, testified that Paccione and Vulpis came to her office in April 1988 on behalf of A & A Land Development and applied for a street opening permit for the Arlington Yard landfill site. The application lists the purpose of the permit as placing fill on the property. The Government introduced evidence, however, that the defendants did not only place fill on the property but used this permit to place garbage and other material at the site. Fealy testified that she issued the permit based on the information given to her by the defendants.

The Government's allegations with respect to the material placed at the Arlington Yard site are supported by the testimony of Peter Lizzio who investigate environmental crimes for the New York City Department of Investigations and who investigated the Arlington Yard property from May 1988 to September 1988. Lizzio's testimony is corroborated by photographs and videotapes taken by his staff and introduced into evidence by the Government. Lizzio testified that on several occasions during May 1988, he observed numerous trucks dumping at the landfill. He also testified that during surveillance in May, he noted two excavating operations occurring simultaneously at the site. During the month of June, Lizzio continued his surveillance of the landfill site and observed trucks moving around at the landfill before dawn on several occasions. As it became light, he saw these trucks dumping garbage, construction, and demolition debris. Lizzio also testified that he noted trucks registered to defendants August, Rosedale, and Vulpis Brothers containing garbage mixed with construction and demolition debris all dumping at the site during the month of June and that this activity was occurring on land owned by CSX Corporation.

Lizzio continued his surveillance in July and August of 1988 and testified that he observed numerous trucks on the landfill and excavation activity occurring on the site during this time. Surveillance video-tapes from this period introduced into evidence show defendant Vulpis at the site, at times apparently directing the dumping of garbage and construction and demolition debris. Lizzio also testified that he saw a number of trucks dump consistently during the summer of 1988. He identified these trucks as coming from the Rosedale transfer station and from the National and Stage transfer station. According to Lizzio, after the garbage was dumped, it was then bulldozed into pits and covered by a reddish clay material. This activity usually occurred in the morning hours.

Fealy also testified that there is a fee that is required to be paid when an application for a street opening permit is made. The fee is calculated by the number of cubic yards of fill that will be placed on the property. The defendants stated on the street opening permit application that approximately 132,000 cubic yards of fill would be placed on the site. The DOT relied on this information in charging the amount for permit fees. However, Dennis Rubin, a partner at Woodward–Clyde, an engineering and environmental consulting firm, testified that the stockpile contained approximately 550,000 cubic yards of material. This testimony supports the Government's claim that the defendants schemed not to report the correct amount of fill that was to be placed on the property, thereby depriving the City of revenues from the licensing fees which would have been collected if the proper amount had been stated.

According to Fealy, Vulpis returned to the DOT in July 1988 and applied for a renewal of the street opening permit. The application for the renewal of the permit was made by Vulpis and Paccione and was signed by Vulpis. Fealy testified that the renewal was also issued to Paccione and Vulpis based on the application for the landfill and was subsequently sent to three other city agencies by mail, including the DOS. This is the mailing specifically alleged in the indictment in Racketeering Act 1c and Count 5.

Fealy also testified that Vulpis submitted an application for a street opening permit

for a different area of land than that of the first permit in the beginning of August of 1988. Vulpis signed the application and the number of cubic yards of fill that would be placed on the property was again submitted with the application. The fee charged with the permit was based on the number of cubic yards indicated on the application.

On the basis of this application, the second street opening permit was approved and issued to Vulpis, Paccione and A & A Land Development. Fealy signed and gave this permit to Vulpis and again, following standard procedure, sent copies to the other city agencies, including the DOS, by mail. This is the mailing specifically alleged in the indictment in Racketeering Act 1d and Count 6. This mailing, along with the one alleged in Racketeering Act 1c and Count 5, is sufficient to show that the execution or attempted execution of the fraudulent scheme involved at least one use of the United States mails.

The evidence described above supports the inference that Paccione and Vulpis, acting on behalf of A & A and with the use of their companies, August, National, Stage, Rosedale, and Vulpis Brothers, participated in a scheme to misrepresent their intentions concerning the operation of the Arlington Yard landfill in order to deprive the City of licensing fees which would have been required for the operation they conducted.

The indictment also alleges a scheme to deprive the DOS of dumping fees. Allison Lewis–Smith, an employee at the DOS, whose responsibilities included issuing the letters of acknowledgement for clean fill grading operations, testified that she would issue a clean fill permit only after all the required documentation had been submitted and an inspection had been made of the site by an engineer to make sure that it complied with all regulations. According to Lewis–Smith, Paccione and Vulpis submitted an application to the DOS for a clean fill permit for the landfill. The application lists Kenneth Wilpon as the actual owner of the property of the proposed landfill operation and describes the kind of material that will be collected by the landfill as "demolition excavation material, used material, etc." and lists the source of the fill material as "excavation and highway material." The application is signed by Vulpis under a statement which says that he acknowledges his responsibilities for operating the proposed landfill in conformance with all regulations and that the statements contained in the application are all true. As indicated above, however, there is evidence that these statements made in the application were not true. According to Lewis–Smith, she relied upon these representations in issuing the permit to Vulpis and Paccione.

Lewis–Smith also testified that she reviewed a property owner's authorization form prior to issuing the landfill permit. The purpose of the authorization form is to show that the owner of the property has given permission to the contractor to perform the proposed grading operation. The authorization form that Vulpis and Paccione filed states that Wilpon, as owner of the property, gave Vulpis and Paccione permission to deposit clean fill there. As indicated above, however, there is evidence that the landfill was not operated on Wilpon's land alone but on CSX property as well. According to Lewis–Smith, without authorization from CSX, the owners of the property where the landfill was operated, she would not have issued the permit.

Lewis–Smith also reviewed the street opening permit from the DOT that Fealy issued to Paccione and Vulpis and that was sent to her by Fealy through the mail in deciding whether to issue a clean fill permit to Paccione and Vulpis for the landfill. This was the mailing specifically alleged in Racketeering Act 1c and Count 5 of the indictment.

The Government alleges that the defendants used these DOS and DOT permits as a cover for the illicit disposal of waste at the landfill through which the defendants defrauded the City of dumping fees to be derived from the lawful disposal of waste materials at the City-owned landfill at Fresh Kills. According to the Government, the DOS lost money because of the decline

in the amount of dump tickets that were bought. This allegation is supported by the evidence introduced by the Government which shows that the purchase of DOS dump tickets by Rosedale and Vulpis Brothers declined from April through July of 1988 and the purchase of DOS dump tickets by National and August declined significantly from May through September of 1988.

In addition, John Raffa, a driver for defendants National and Stage, testified that he used to pick up garbage from clients and bring it back to the National and Stage transfer station. After that, the garbage would then be taken to the city owned Fresh Kills landfill. Raffa said this practice changed in the spring or summer of 1988 because the garbage was then brought to the landfill at the Arlington Yard. Raffa said that Paccione told him to go to the landfill and that he gave him directions on how to get there. Raffa also said that when he went to the landfill, he had to present a dump ticket at the entrance. There is further evidence which shows that other companies also brought their materials to the Arlington Yard landfill, depriving the City of additional dumping fees which would have been derived from the disposal of the waste at the City-owned facility at Fresh Kills.

According to the indictment, the schemes to defraud the City also involved a letter from defendant Paccione to Lewis–Smith, the mailing specifically alleged in Racketeering Act 1e and Count 7. An audiotape introduced into evidence by the Government of a conversation between Lewis–Smith and Paccione at a meeting in late August indicates that he promised to send her copies of the engineering reports of soil testing that were being done on the Arlington Yard site. Lewis–Smith testified that she had received a letter from Paccione through the mail enclosing copies of certain soil tests from the site. However, there is evidence that Paccione lied with regard to the testing. An employee from Hart Associates, who was to be coordinating the testing, was not at the site on a daily basis as Paccione had stated. In addition, Robert Ehlers, an employee of Hart Associates,

testified that he never collected the samples himself and did not see from where some of the samples were taken. Ehlers also testified that defendant Weiss told him that the testing was being done for Pat Lomano of the DOS. Ehlers recommended to Weiss that samples should be collected from one out of every ten trucks at the site. However, during the entire time that Ehlers was a consultant for A & A Land Development, he only received ten samples. After receiving the samples, Ehlers sent them to the Accutest Labs for testing.

Vincent Pugliese, who is employed by Accutest, testified that Weiss never told him where the samples were coming from or what the samples were. Pugliese testified that between June and September of 1988, he received 23 samples in all from Weiss. Much of the information that Accutest used in its test results were taken from the information on the samples sent by Weiss which were never confirmed. Accutest also expressed concern to Weiss over the chain of custody that was occurring with the samples. However, according to Pugliese, Weiss did not comply with Accutest's requests to change this process.

In sum, the court finds that the evidence recited above is sufficient for a jury to infer beyond a reasonable doubt that the defendants Paccione, Vulpis and their affiliated partnership and corporations unlawfully, wilfully and knowingly engaged in a scheme to defraud the City of New York of money through revenues from licensing fees and dumping fees.

### 2. Racketeering Act 3d and 4a–i and Counts 8 and 9: Mail and Wire Fraud on CSX

The indictment charges that the defendants Paccione, Vulpis and their affiliated partnership and corporations engaged in a scheme to defraud CSX of money and property, specifically, to devalue CSX property by removing clean fill from the land and by dumping waste materials onto the site. According to the indictment, the defendants achieved this by making a series of false and fraudulent representations to CSX concerning the operation of a landfill

on CSX property, which included statements that only clean fill was being deposited on the property and that it was all being deposited on Wilpon's property.

Joseph Langley, development manager for CSX Realty, testified that he first became involved with the property at the Arlington Yard when in late 1987 he undertook a study of the property to determine whether it could be used for residential purposes. Langley recommended that the property be rezoned for residential use and estimated that the property had a value of $20 million if it was to be rezoned. Langley then testified that the idea of placing clean fill on CSX's property arose in May 1988 when Wilpon suggested the idea to Thomas Dunck, another employee at CSX. Wilpon told Dunck that he was considering a proposal by the defendants to place clean fill on the property. Dunck wrote a memo to the other representatives at CSX, introduced into evidence, concerning the proposal and then wrote a letter to Wilpon on May 19, 1988, also introduced into evidence, which said that the proposal would be considered by CSX. However, the letter also said that there were some serious concerns about assuring that the end result of the proposal by the defendants would be the improvement of the value of the property. Dunck testified that by sending this letter he was not giving Wilpon approval to place fill material on the CSX property.

Dunck also testified that in early June there were still problems with the Wilpon proposal about which the CSX representatives were concerned and which had to be remedied before any agreement could be made. According to his testimony, on June 17, he wrote a memo to another employee at CSX, introduced into evidence by defendants, and confirmed that the removal of any contaminated soil was made a condition to any agreement and that this was the responsibility of the contractor [Paccione, Vulpis, and A & A] who would be filling the property. The memo stated that "the contractor is aware of this requirement and has agreed to it." This is evidenced by a hold-harmless letter sent by Paccione and Vulpis on behalf of A & A Land Development to Dunck at CSX, which is the mailing specifically alleged in the indictment in Racketeering Act 3d. Langley testified that the discussions continued in June and July of 1988 and that he was not aware of any filling procedures that were actually being conducted on CSX property at the time or that anyone else had given permission for any filling procedures to be conducted. Dunck also testified that in no time in July 1988 did he authorize Paccione, Vulpis, Weiss, Wilpon, or anyone else to place fill material on CSX property.

After a discussion with Dennis Rubin from Woodward–Clyde, in July, 1988, Langley spoke to Wilpon and Weiss and told them that waste material had been found on the site to which they responded that there was no such material on the property. However, as indicated above, there is evidence that waste material had been placed on the property by this time. In addition, Rubin testified that when he went to the landfill site with Langley, he observed construction activities in progress. After confronting Weiss about the purpose of these construction activities, Weiss told them that the construction was needed in order to dig out the unsuitable material on the property and replace it with other material in order to support the new residential complex which they said they had begun to build. However, there is evidence that the purpose of the construction activity that was occurring on the property was to further the use of the landfill as a dumping site. Rubin also testified that the material that naturally occurred on the property was suitable for construction and the defendants did not have to dig in order to stabilize the property, as Weiss had contended.

Langley also testified that on July 27, 1988, he went to visit the Arlington Yard site and saw what appeared to be a major construction or grading operation taking place on the property of CSX. This is when the CSX representatives learned that large amounts of waste materials had been dumped on CSX property. Langley then had a meeting with Weiss, Paccione, and Vulpis in the construction trailer of A & A Land Development at which time he saw a

constant stream of dump trucks entering the site at a rate of five to ten per hour. Langley also testified that he saw a mixture of garbage and construction debris coming out of the trucks and there was a very offensive smell in the area, like garbage. Weiss again told him that they were trying to improve the property and that all the activity occurring was for CSX's benefit. Langley and the other CSX representatives then told defendants Weiss, Paccione, and Vulpis that they had no authority to be conducting the operation on CSX property, that they did not have permits to be filling on CSX property and that they should stop all dumping. In telephone conversations between Weiss and Stephen Beck of CSX on July 27 and August 1, 1988, which are the calls specifically alleged in Racketeering Acts 4d and 4e and which are referred to in letters introduced into evidence, Beck reiterated the demands made at the meeting on July 27 and put the defendants on notice that any unauthorized entry onto the CSX land constituted grounds for legal action by CSX. In addition, Langley noticed that the permits that the defendants did possess applied to Wilpon's property and that the plans he viewed were for industrial development, not residential development as CSX had previously planned.

Langley then testified that after viewing the site, he told Rubin to begin immediate surveillance of the property to see if the filling continued after the defendants had been told to stop. Rubin returned to the site on August 1 and met with Vulpis. He testified that the excavation of the pits was still occurring and that trucks were arriving once every five to eight minutes. Rubin also said that this activity was definitely taking place on CSX property, west of the place where Weiss said the border between the CSX and the A & A Land Development property existed. Langley then wrote a memo, introduced into evidence, to Brian Gabriel of CSX on August 3, 1988 and said that Rubin told him that the unauthorized filling and grading was continuing on the property. Langley then called Weiss to repeat the demands to vacate the CSX property immediately. Weiss told him not to be concerned. This is the telephone call specifically alleged in the indictment in Racketeering Act 4f. On the same day, Langley wrote another memo to Gabriel, also introduced into evidence, and said that Weiss called him to tell him they received a permit for filling and grading the CSX property. Weiss also said that the Hart testing identified high levels of asbestos on the CSX property and the asbestos was not the result of the unauthorized filling activities. Weiss also said on the same day that the asbestos levels on the property were not high enough to cause concern. This telephone call is the one specifically alleged in Racketeering Act 4g of the indictment. With respect to the testing, Weiss also told Dunck that testing was being done on a daily basis, that test samples were being taken from each load as it came in, and that the samples were being forwarded to Hart and then to Accutest. According to Ehlers and Pugliese, these statements were not correct.

Langley also testified that on August 4, 1988, he, Gabriel, and Rubin met with Paccione, Vulpis, and Weiss. Gabriel again told them that they had no authority to conduct the filling operation on CSX property and said that they should stop immediately. Vulpis, like Weiss previously, told Langley at the meeting that they were doing them a favor by continuing the activity and that they were looking after CSX's interests. Meanwhile, at the same time, the defendants were continuing to operate a landfill on the property. Rubin testified that he observed trucks dumping at the site and that he smelled a garbage odor coming from the pits.

According to Langley, he and Gabriel had an attorney for CSX draft three letters concerning the actions which should be taken to stop the activity from continuing on the CSX property. One of these letters, the mailing specifically alleged in Racketeering Act 4b and Count 9, was directed to Wilpon and Weiss and spoke of the illegal and unauthorized landfill operation and again instructed them to vacate the property. Another letter, the mailing specifically alleged in Racketeering Act 4a and Count

8, was directed to Paccione and Vulpis at A & A Land Development and stated that the excavations and landfill operations were unauthorized and illegal and directed them to stop immediately. It also stated that they were not even allowed on the property. Vulpis responded to the letters that were sent by CSX representatives concerning the landfill in a letter to Gabriel, the mailing specifically alleged in the indictment in Racketeering Act 4c, and said that they made commitments to have the material on the property removed beginning on August 22. However, there is substantial evidence that the dumping continued at the landfill subsequent to this date.

On August 8, 1988, there was a meeting of CSX representatives in regards to the landfill site. During a conference call with Weiss and Wilpon, which is Racketeering Act 4i, Dunck told them that notwithstanding their earlier assurances, activity was occurring at the CSX property, without the authorization of CSX and that they demanded that they stop immediately. Dunck summarized the points discussed in this conversation in an internal CSX memo, introduced into evidence by Defendants, which also makes reference to the telephone call alleged in the indictment in Racketeering Act 4h.

Langley and Dunck returned to the property with Gabriel and Beck on August 18 and met with Paccione, Vulpis, Weiss, and Ehlers from Hart Environmental. Weiss told them at the meeting that the material placed on the site was clean fill and that it was the custom in New York that a percentage, usually 5–10% of the material placed on the site, could have things such as wood or other organic types of material in it and still be called clean fill. Meanwhile, Langley testified that he observed that the mound that was on CSX property had continued to increase in size and that the dumping operation had been continuing unabated. CSX also obtained a temporary restraining order issued by the court on August 19, 1988 to keep Wilpon, Weiss, Vulpis, Paccione and A & A from entering the property and performing any activity on the property. There is evidence, however, that this restraining order was not adhered to by the defendants.

From the evidence recited above, the court finds that there is sufficient evidence to infer that the defendants Paccione, Vulpis and their affiliated partnership and corporations unlawfully, wilfully and knowingly engaged in a scheme to defraud CSX of money and property, specifically to devalue CSX property by removing clean fill from the land and by dumping waste materials onto the site.

3. *Racketeering Act 12: Mail Fraud on State Government Agency*

■■■ The indictment charges that defendants Paccione, Vulpis, McDonald and their affiliated corporation New York Environmental Contractors ("NYEC") engaged in a scheme to defraud the State of New York of property in the awarding of a waste transporter permit to NYEC. It is alleged that the defendants achieved this by making false and fraudulent representations directly to the New York State Department of Environmental Conservation ("DEC") in order to obtain the permit to transport infectious medical waste. These statements included that McDonald was 100% owner of NYEC and that the New Hanover incinerator in Pennsylvania had granted permission to NYEC to deliver infectious waste to their facility.

Rocky Piaggone, of the Division of Environmental Enforcement of the DEC, testified that in order for a private carting company to transport medical waste, the company had to obtain a Part 364 permit from the DEC. Piaggone testified that the private carting company had to obtain prior permission of a waste disposal facility to bring waste there in order to receive a Part 364 permit and that the waste had to be disposed of at the facility specified on the permit. Part C of the application provided this information along with the type of waste to be transported.

Norman Drapeau, supervisor of the waste transporter permit section of the DEC, testified that his office received Part C of a waste transporter permit application from defendant McDonald on behalf of NYEC on February 26, 1988. This is the

mailing specifically alleged in Racketeering Act 12a. The application lists the New Hanover incinerator as the treatment, storage or disposal facility and states that they are located in "Permieonville," Pennsylvania. It also lists Stephan "Stezento" as the contact person at the facility and contains the signature of "Stephan Stezento" with his name printed alongside. However, Stephan Stezenko testified that he never heard of a company called New York Environmental Contractors. Stezenko also testified that he did not recognize any of the handwriting on Part C of the application and said that he had never seen the document prior to discussions concerning the case. He said that the document does not contain his signature and that his name, as well as the town where the New Hanover incinerator is located, Permieonville, were misspelled. Finally, Stezenko testified that the New Hanover incinerator never received infectious medical waste from NYEC.

Gus Lesnevich, a handwriting expert, testified that after performing an analysis of the handwritings on Part C of the waste transporter permit application and handwriting specimens of McDonald, he concluded that the signature of Stephan Stezenko was probably written by McDonald. Lesnevich also stated that the handprinted text on the application also was written by McDonald.

According to Drapeau, in response to the application containing the statements regarding the New Hanover incinerator, the DEC issued a waste transporter permit to NYEC on March 31, 1988, authorizing them to dispose of the medical infectious waste at the New Hanover incinerator. This is the mailing specifically alleged in Racketeering Act 12b.

Drapeau also testified that the DEC received an amended waste transporter permit application dated October 19, 1988 from McDonald on behalf of NYEC, the mailing specifically alleged in Racketeering Act 12c. At that time, there were additional sections on all waste transporter permit applications, Parts D and E, which provided background information on all applicants.

Part D was signed solely by McDonald and indicates that he was the 100% owner of NYEC. However, there is evidence that McDonald was not the sole owner of NYEC but that Paccione, Vulpis and McDonald each possessed a ⅓ interest in the company. This is illustrated by a waste transporter permit application submitted to the DEC by New York Environmental in March 1989. In that application, Paccione, Vulpis and McDonald each are listed as having a ⅓ interest in the company, with the interest dating back to August 15, 1988. This is prior to the date of the application submitted by NYEC on October 19, 1988, where it is stated that McDonald owns a 100% interest. This application is also signed by Paccione, Vulpis and McDonald, unlike the prior application which is only signed by McDonald. According to Drapeau, in response to the amended application with these statements, the DEC issued the amended waste transporter permit on October 21, 1988.

The court finds from the evidence recited above that there is sufficient evidence that the defendants Paccione, Vulpis, McDonald and their affiliated corporation New York Environmental Contractors unlawfully, wilfully and knowingly engaged in a scheme to defraud the State of New York of property by depriving the DEC of control over the process of awarding a waste transporter permit to NYEC.

4. *Racketeering Act 13–17 and Count 12: Fraud on Doctors and Medical Care Facilities By New York Environmental*

 The indictment charges that the defendants Paccione, Vulpis, McDonald and their affiliated corporation, NYEC, engaged in a scheme to defraud doctors and hospitals which generated medical and infectious waste materials of money and property. The Government contends that the defendants accomplished this by charging the generators the rates required for the lawful transfer, storage and disposal of this waste which was higher than the rates actually incurred by transferring, storing and disposing of the waste illegally. The Government also contends that the defendants exposed the generators to potential

civil and criminal penalties for the illegal transfer, storage and disposal of such waste.

Rocky Piaggone testified that the penalties for the unlawful transportation of infectious waste were not distinguishable among the transporter, the disposer or the generator. Regardless of the intent of the person involved, they could be held responsible. If a generator turned over its waste to a transporter whom they thought was permitted but actually was not, they violated the law.

As stated previously in this Opinion, there is evidence indicating that NYEC possessed a Part 364 permit from the DEC to transport infectious medical waste which required NYEC to dispose of the waste at the New Hanover incinerator in Pennsylvania. Dr. Lloyd Cyprys, Dr. Annamma Vinograd, Dr. Ramon Vado, Joanne Adelfio from Long Island College Hospital and Marjorie Sitro from the Brooklyn Kidney Center all testified that NYEC transported their infectious medical waste. However, the testimony discussed above of Stephan Stezenko of the New Hanover incinerator, indicates that none of the waste was ever disposed of at that facility. In addition, according to the manifests that were given to these generators, a South Carolina site was to be the designated waste disposal facility for the generators' medical waste. However, there is evidence that most of the waste that was picked up from these generators did not go to the South Carolina facility either. By not transporting the waste to the facility they were required to by the DEC permit, the defendants exposed the generators to potential civil and criminal penalties.

The Government also contends that NYEC illegally stored and transferred infectious waste in unlicensed vehicles and at unlicensed facilities. Jim Milewski, an environmental conservation officer at the DEC, testified that on September 16, 1988, he went to the National and Stage transfer station to examine a tractor trailer parked outside the facility. The trailer had the word Rosendale written on its side with DEC permit number 2A187, which was the waste transporter permit issued to NYEC. Milewski testified that he observed blood dripping from the trailer onto the pavement, which constituted a DEC violation for failing to contain the waste. When the trailer was eventually opened for inspection, boxes marked medical waste were observed. Milewski testified that the trailer was not permitted to haul infectious medical waste and that the trailer should have been labeled "infectious" on the side, which was also a violation of DEC rules. Milewski identified the medical waste on the trailer to include waste from Long Island College Hospital and the Brooklyn Kidney Center, further evidence that the medical waste that was picked up from these generators was not brought to the South Carolina site as stated on the manifests they were given.

The generators also testified that they received letters and invoices from NYEC through the mail. These are the mailings specifically alleged in the indictment in Racketeering Acts 13–17 and Count 12. The Government argues that the defendants used these mailings for the purpose of executing the scheme to defraud the generators. The generators testified that they received bills in the mail from NYEC for their services and that they paid for the lawful transfer, storage and disposal of their medical waste. However, the evidence supports the inference that this is not the service they received.

One of these mailings, an advertisement sent by NYEC to potential customers, asserts that NYEC is licensed by New York State and permitted to handle generators' medical waste needs and that in order to avoid being prosecuted for the illegal dumping of their medical waste, generators should use NYEC as their waste transporter. Another promotional letter states that NYEC will transport the generator's medical waste to the licensed incinerator facility by their vehicles which have been specifically approved for infectious waste by the DOT. The letter also states that the medical waste will be incinerated within 24 hours of pickup. As seen from prior testimony, however, the evidence supports the inference that these assertions on the part

of NYEC were not true. At the same time, the advertisements support the inference that the generators discussed above paid NYEC to dispose of their waste lawfully, precisely because they were concerned about potential liability to themselves if their waste were unlawfully disposed of.

The court finds from the evidence recited above that there is sufficient evidence that the defendants Paccione, Vulpis, McDonald and their affiliated corporation, NYEC, unlawfully, wilfully and knowingly engaged in a scheme to defraud doctors and hospitals which generated medical and infectious waste materials of money and property by charging prices for services which were not provided and by exposing the generators to potential civil and criminal penalties.

*Relationship Plus Continuity*

█ Having set forth the evidence with respect to the racketeering acts charged in the indictment, evidence of a pattern of racketeering activity is demonstrated by the fact that at least two of the racketeering acts allegedly committed by each defendant were related by common participants, victims, methods, purposes or results and that they amount to or demonstrate a threat of continued racketeering activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *see also, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc), *cert. denied*, —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). The existence of such a threat is shown by evidence that the related predicate acts themselves involve a distinct threat of long term racketeering activity. The threat of continuity can also be established by showing that the racketeering acts can be attributed to a defendant operating as part of a long term association that exists for criminal purposes or where the racketeering acts are a regular way of conducting or participating in an ongoing and legitimate RICO enterprise. *H.J.*, 492 U.S. at ——, 109 S.Ct. at 2902, 106 L.Ed.2d at 209–10. In the instant case, both the relatedness of the racketeering acts alleged and the threat of continued racketeering activity can be found in the operation of the landfill which was closed down by the Government and the waste disposal operation which allegedly continued at least until the date of the instant indictment. Since at least two of the racketeering acts allegedly committed by each defendant illustrate relatedness plus a threat of continued racketeering activity, these acts constitute a pattern within the meaning of the RICO statute. *Indelicato*, 865 F.2d at 1383.

d. *Participation in the Enterprise through a Pattern of Racketeering Activity*

█ The fifth and final element of a RICO offense which the Government must prove beyond a reasonable doubt is that a defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity previously discussed.

The facts recited above are adequate to establish that each defendant engaged in a pattern of racketeering activity and that the defendant's employment by or association with the enterprise facilitated or influenced his commission of the racketeering acts. The facts are also sufficient to show that the racketeering acts had some or were intended to have some impact or effect in furtherance of the affairs of the enterprise—the enrichment of the individual defendants and their affiliated partnership and corporations through the operation of an illegal landfill and the disposal of waste materials in violation of federal, state and local law. Since the evidence shows that each defendant's employment by or association with the enterprise facilitated or influenced their commission of the racketeering acts, and since those racketeering acts were intended to have and did have some impact or effect on the enterprise, the Government has sufficiently demonstrated the requirements of this element of the RICO offense.

## II. COUNT II—RICO CONSPIRACY

█ Count Two charges each defendant with unlawfully, wilfully and knowingly conspiring to conduct and participate, directly and indirectly, in the affairs of a

racketeering enterprise through a pattern of racketeering activity including mail and wire fraud in violation of 18 U.S.C. Sec. 1962(d).

In this case, the evidence for an agreement on the defendant's part to violate Sec. 1962(c), the substantive RICO offense, is the evidence that they committed at least two of the racketeering acts with which they are charged. As the court found above, the Government has introduced sufficient evidence upon which a reasonable jury could find each defendant's guilt beyond a reasonable doubt as to the counts charged in the indictment. In view of this finding there is evidence sufficient to show that the defendants agreed to commit at least two racketeering acts and participate in the affairs of a racketeering enterprise through a pattern of racketeering activity.

## III. CONCLUSION

On the basis of the evidence presented by the Government in its direct case and recited in this Opinion, the court finds that the defendants Paccione, Vulpis, Weiss, McDonald and their affiliated partnership and corporations unlawfully, wilfully and knowingly became members of and participated in the RICO conspiracy charged in Count Two of the indictment. Accordingly, pursuant to *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), co-conspirator declarations made in furtherance of the conspiracy may be considered by the jury against each defendant with respect to the conspiracy charged.

As to the defendant's motions for a judgment of acquittal on all counts pursuant to Fed.R.Crim.P. 29, the evidence presented by the Government in its direct case and recited in this opinion is sufficient to withstand those motions.